IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| B2GOLD CORP. and DALE CRAIG, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-1202-TSE-IDD |
| | ) | _____ |
| PHILIP BRYSON CHRISTOPHER, | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| _____ | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiffs B2Gold Corp. and Dale Craig, filing their First Amended Complaint as a matter

of course under Federal Rule of Civil Procedure 15(a)(1)(B),[1] complain and allege against

Defendant Philip Bryson Christopher ("Christopher") as follows:

**INTRODUCTION**

1.      Christopher uses false and malicious defamation in his attempts to extort his

victims—and he believes, incorrectly, that he can do so without consequences.  In this case,

---

[1]      Christopher has filed no responsive pleading or Rule 12 motion in response to the
original complaint in this matter.  As such, Plaintiffs are filing this amended complaint as a
matter of course.  Fed. R. Civ. P 15(a)(1)(B).  *See Swanigan v. City of Chi.*, 775 F.3d 953, 963
(7th Cir. 2015) ("Because no responsive pleading or motion to dismiss had been filed, the 21-day
clock under Rule 15(a)(1)(B) never started and Swanigan retained the right to amend his
complaint."); *Family Med. Pharmacy LLC v. Owen Mumford USA, Inc.*, No. 15-00290-N, 2015
U.S. Dist. LEXIS 108643, at *2-3 (S.D. Ala. Aug. 18, 2015) ("The service of a responsive
pleading or Rule 12(b), (e), or (f) motion does not act as a 'starter pistol' to the plaintiff's right
to amend as a matter of course under  Rule 15(a)(1)(B).  Rather, it simply marks 'the beginning of
the end,' commencing the 21-day countdown to the closing of the right.").  *See also St. John v.
Moore*, 135 F.3d 770 (4th Cir. 1998) (unpublished) (holding that since no responsive pleading
has been served, "entitlement to amend was not a matter of the court's discretion").  This First
Amended Complaint contains the same defamation claim against Christopher as in the original
complaint, drops all other counts and other defendants from the lawsuit, and invokes this Court's
diversity jurisdiction.

Christopher harassed Plaintiffs for months, threatening defamation, a "global media campaign to discredit" Plaintiffs, and even violence and bodily harm unless Plaintiffs gave into his demands to pay him and his cronies millions of dollars.  When Plaintiffs ignored Christopher's threats, Christopher sent Plaintiffs pictures of dead bodies and began a calculated campaign to defame Plaintiffs.  Christopher went so far as to create a false and malicious report—deliberately and falsely constructed to appear to be a legitimate report prepared by an independent third-party expert—alleging that Plaintiffs were, among other things, involved in a "criminal conspiracy," lying to American investors and the SEC, bribing judges and police in Nicaragua, violating American laws, coercing and strong-arming vulnerable populations, and directing a lawless paramilitary group to commit violence.  Then Christopher, a Virginia resident while in the Eastern District of Virginia, distributed that false report to American investors, non-governmental organizations, and US government officials, among others.  Christopher threatened further defamation if Plaintiffs did not give into his demands.  Plaintiffs did not give in.

2.	Because Christopher, after being personally served with the original complaint in this lawsuit, has refused to respond for nearly a year, Plaintiffs have been unable to use discovery to learn the full scope of his defamatory conduct and statements or the number of individuals and entities who have received or continue to receive the false and defamatory report and other defamatory statements.  But Plaintiffs do know, from the numerous investors and organizations that did alert Plaintiffs to their receiving the defamatory report, that Christopher distributed the report far and wide.  And Plaintiffs also know that, over a year later, the false claims originating in the report continue to resurface and spread like a virus that will likely never completely go away.  Plaintiffs therefore bring this defamation *per se* action to hold Christopher accountable for his actions.

## THE PARTIES

3.     Plaintiff B2Gold is a Canadian corporation headquartered in Vancouver, British Columbia.  B2Gold is listed on the NYSE American, the Namibia Stock Exchange, and the Toronto Stock Exchange.  B2Gold operates gold mines all over the world, including La Libertad Mine in Nicaragua.

4.     Plaintiff Craig is a Canadian citizen domiciled in the province of British Columbia.  Craig is Vice President of Operations at B2Gold.

5.     Defendant Christopher is a citizen of the United States domiciled in the Commonwealth of Virginia.  Since approximately 2004, Christopher has conducted business activities in Nicaragua.  Christopher splits his time between the United States and Nicaragua, traveling back and forth several times per year.  Default was entered against Christopher in this action on November 8, 2018, *see* Dkt. 10, and Christopher has never sought to defend this action or set aside the entry of default.

## JURISDICTION AND VENUE

6.     Under 28 U.S.C. § 1332(a)(2), this Court has diversity jurisdiction over Plaintiffs' state-law claim because Plaintiffs both are citizens of Canada headquartered or domiciled in Canada, Defendant Christopher is a citizen of the United States domiciled in the Commonwealth of Virginia, and the matter in controversy exceeds $75,000.

7.     This Court has already found it may exercise personal jurisdiction over Christopher in this matter.  Dkt. 30 at 3.

8.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.  In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

**I.     Defendant Christopher and His Enterprise of Co-Conspirators Regularly Use Defamation as a Tool of Extortion**

9.     Defendant Christopher is associated with a group of co-conspirators with whom he carries out his defamation and extortion activities ("the Enterprise").  The Enterprise consists of or has consisted of the following individuals and entities:

      a.     Christopher;

      b.     AURUM S.A. ("AURUM") (sometimes referred to as "Aurem"). AURUM is a Nicaraguan corporation with its principal place of business in Nicaragua;

      c.     Flor de Mayo S.A. ("Flor"). Flor is a Nicaraguan corporation with its principal place of business in Nicaragua.  Christopher is President of Flor and owns approximately 44% of Flor's shares;

      d.     Edwin Alfredo Kauffmann Blandino ("Kauffmann"). Kauffmann is the President of AURUM and, on information and belief, operates AURUM along with others in the Kauffmann family;

      e.     Eduardo Ruben Gonzalez Lopez ("Gonzalez Lopez");

      f.     Eduardo Ruben Gonzalez Guzman ("Gonzalez Guzman");

      g.     Spectre Associates; and

      h.     Other co-conspirator individuals and entities, both known and unknown.

10.     Hereafter, for ease of reference, the names of Enterprise members or references to Enterprise members are in **bold.**

11.     One purpose of the Enterprise is to enrich itself and its associates by defrauding and extorting individuals and entities, especially those with real property interests.  To accomplish this purpose, **Christopher** and the Enterprise conspire to and conduct the affairs of the Enterprise to systematically extort and attempt to extort victims through intimidation, threats, violence, and defamation, and to defraud and obtain money and property through materially false

statements and representations.

12.     Since as early as 2008, **Christopher** and the Enterprise have used defamation to unlawfully extort money, real estate, and property rights in Nicaragua.

13.     For instance, **Christopher** and **Flor,** acting on behalf of the Enterprise, have attempted, and continue to attempt, to extort Jackson Rowland and his family (the "Rowlands") through defamation.  The Rowlands are working or have worked with an Indigenous tribe to build a hotel on property adjacent to a property that **Christopher** claims he owns in Nicaragua.

14.     Specifically, in a series of emails and messages that have continued from 2014 until at least July 2018, **Christopher** has falsely accused the Rowlands of purchasing illegal leases in Nicaragua and being "knee deep in a criminal conspiracy."  In threatening to expose this conspiracy, **Christopher** has repeatedly demanded payment from the Rowlands.

15.     Through these messages to the Rowlands, **Christopher** has falsely accused the Rowlands of financing murder.  For example, **Christopher** has stated:

    a.     "You are responsible for this murder! Please find your ethics and move into the light. Cease paying the illegal lease to the murderous old Directiva and buy the titles from the legal owners."

    b.     "Two men, good men, men with families have been murdered in the last two years because of illegal land trafficking in Las Salinas with the single biggest reason being your sons purchase of his illegal lease."[2]

16.     **Christopher** has also repeatedly threatened to go to government authorities, including the United States government, to report the Rowlands' so-called conspiracy:

    a.     "I have spoken already with US Embassy.  They are looking into ho can communicate with Australian Embassy.  I have begun the process, albeit slowly and carefully t have your family placed on watch list here in US."

---

[2]     This Complaint frequently quotes **Christopher's** threatening communications.  The grammar and spelling errors in the quotations are in the original text and are **Christopher's** errors.

b. "Provided in a meeting at US State Department last week all the details on your conspiracy to traffic land working closely with SCJ Ileana Perez. Made sure.they knew.that your place was the central distribution center of local tourism cocaine.  Of course, everyone in village knows.  You are a. Sandy scumbag, paying everyone off for years."

## II. B2Gold's Land and Mining Interests That Christopher Seeks to Extort and Undermine Through Defamation

17. **Christopher** and the Enterprise have now set their sights on extorting Plaintiffs through defamation and threatened defamation.  This section provides the necessary background to **Christopher's** defamation of Plaintiffs, the interests motivating this defamation, and why this defamation is false, scandalous, and scurrilous.  Specifically, this section describes B2Gold's exclusive mining rights and property in La Libertad, Nicaragua (*i.e.*, the property primarily motivating **Christopher's** attempt to extort Plaintiffs through defamation and threats of defamation), and the initial attempts of **Christopher** and the Enterprise to obtain the mine in La Libertad.

### A. <u>B2Gold Acquires the Rights to Mine La Libertad</u>

18. In the 1980s, the Nicaraguan government nationalized the mining industry. During this period, mining in La Libertad, Nicaragua, was largely conducted by miners with small-scale operations.

19. The Nicaraguan government began privatizing the mining industry in the 1990s. In 1994, a Presidential Decree authorized the privatization of La Libertad mining assets as a concession ("the Concession").  With the Concession came a number of surface and mineral property rights.

20. The Concession was initially held by Minera Nicaragüense S.A. ("MINISA").

21.  In 1996, MINISA came under new ownership.  The name of the new company was changed to Desarollo Minero de Nicaragua, SA ("DESMINIC").

22.     In 2009, after a series of mergers and acquisitions involving DESMINIC, B2Gold acquired DESMINIC as a wholly owned indirect subsidiary.

23.     Through DESMINIC, B2Gold holds the rights to the Concession and real property in La Libertad awarded by the Nicaraguan government during privatization.

**B.      B2Gold's Agreement with Artisanal Miners**

24.     After privatization, Nicaraguan law allowed certain artisanal miners to continue limited mining operations in La Libertad.  By law, these artisanal miners are only allowed to use hand methods to mine.  Artisanal miners are not allowed to hire employees, use mechanized equipment, or drill and blast.

25.     Artisanal miners have the right to 1% of the Concession, but the areas that they are allowed to work in are subordinate to the rights of the Concession owner, and artisanal miners are not allowed to work in close proximity to commercial mining operations.  As the Concession holder, B2Gold (through DESMINIC) retains priority mining rights within the Concession under Nicaraguan law, including the right to prohibit any other commercial mining operations within the Concession.

26.     Many artisanal miners in La Libertad are organized into cooperatives.  Under this system, small areas (approximately 40 meters square) are registered with a cooperative.  To preserve order, the cooperative retains the power to assign to artisanal miners the rights to mine an area to the exclusion of other artisanal miners but subordinate to the rights of the concession holder.

27.     In 2009, B2Gold (through DESMINIC) entered into an agreement with an artisanal mining cooperative known as the Cooperativa De Produccion de De Pequenos Mineros De La Libertad Chontales, R.L. ("COOPEMILICH").  Under this agreement (the "2009 COOPEMILICH Agreement"), artisanal miners agreed to relocate to different mining areas

within the Concession if DESMINIC (1) compensated the artisanal miners; and (2) gave the artisanal miners six months' notice to vacate the area. The 2009 COOPEMILICH Agreement expressly recognizes that B2Gold (through DESMINIC) retains priority rights within the Concession as provided under Nicaraguan law. By agreement with B2Gold (through DESMINIC), COOPEMILICH's power to assign areas to artisanal miners is subordinate to B2Gold's (through DESMINIC) Concession rights.

28.     The mayor of La Libertad and representatives of the Nicaraguan Ministry of Energy and Mines ("Ministry") were guarantors of the 2009 COOPEMILICH Agreement.

### C.     <u>Jackson Tunnel</u>

29.     **Gonzalez Lopez** is a miner and member of COOPEMILICH. He and his son, **Gonzalez Guzman**, operate the mining works in the area known as Jackson Tunnel (sometimes referred to as "El Jackson" or "Jackson Mine") in the San Juan region of La Libertad.

30.     B2Gold (through DESMINIC) owns the real property at Jackson Tunnel. The real property at Jackson Tunnel is located within the Concession.

31.     At the time of the 2009 COOPEMILICH Agreement, **Gonzalez Lopez** held the artisanal mining rights at Jackson Tunnel, and as a member of COOPEMILICH, he was bound by the terms of the 2009 COOPEMILICH Agreement. The rights at Jackson Tunnel are therefore governed by the 2009 COOPEMILICH Agreement with B2Gold (through DESMINIC) and subordinate to B2Gold's (through DESMINIC) Concession rights.

32.     After the 2009 COOPEMILICH Agreement was in effect, **Gonzalez Lopez** and/or **Gonzalez Guzman** entered into agreements purporting to sell possessory real property and mining interests in Jackson Tunnel they did not have. **Gonzalez Lopez** only had the right to work the Jackson Tunnel area as an artisanal miner and had no possessory rights to sell the real property interest, mining interests, or any other interest in the Jackson Tunnel.

33.     For example, in 2014, **Gonzalez Guzman**, claiming to act with power of attorney for **Gonzalez Lopez**, entered into an agreement purporting to give **AURUM** interests in Jackson Tunnel.  Specifically, **Gonzalez Guzman**, on behalf of his father, **Gonzalez Lopez**, with a General Power of Attorney, entered into an agreement with **AURUM** whereby **AURUM** agreed to provide logistics, machinery and equipment, tools, provisions, and inputs to mine Jackson Tunnel and to share 50% of the profits.

34.     In or about February 2015, **Gonzalez Guzman**, on behalf of his father, **Gonzalez Lopez**, with a General Power of Attorney, purported to transfer partial rights of ownership to Jackson Tunnel to **AURUM** and **Kauffmann**.   The new composition of the purported association became AURUM 50%; Gonzalez Lopez, 44%; and Kauffmann, 6%.

35.     **Gonzalez Lopez** and/or **Gonzalez Guzman** falsified documents, including a land survey, in an attempt to register and show that they own Jackson Tunnel as a mining concession and that they own the surface rights at Jackson Tunnel.  Several different drafts of survey maps were shown by **Gonzalez Lopez** to different governmental authorities, including the "Ministry" and the Municipality of La Libertad, in **Gonzalez Lopez's** attempt in registering the working area he was mining.

**D.     B2Gold Exercises Its Rights Under Nicaraguan Law and the 2009 COOPEMILICH Agreement**

36.     On or about February 21, 2017, B2Gold (through DESMINIC) notified COOPEMILICH that it intended to commercially mine the region within its Concession in the San Juan sector of La Libertad where Jackson Tunnel is located and that, pursuant to the terms of the 2009 COOPEMILICH Agreement, it would work with COOPEMILICH and all miners in the region, with the participation of the Ministry, to ensure an orderly relocation within six months of the notice.   In addition to B2Gold's six-month notice, Nicaraguan Mining Law prohibits

9

artisanal or small miners from mining any area within the perimeter of a concession without the agreement of the concession holder.

37.     In response to the notice, COOPEMILICH, per the 2009 COOPEMILICH Agreement, reached an accord with B2Gold (through DESMINIC) in May 2017 for the process to be used for compensation and, in August 2017, an accord for compensation and relocation.

38.     **Gonzalez Lopez**, as a member of COOPEMILICH, participated in an Extraordinary Meeting of COOPEMILICH members and voted to allow a special committee from COOPEMILICH to negotiate the compensation for relocation.

39.     All of the miners that belonged to COOPEMILICH except **Gonzalez Lopez** vacated their mining areas and respected the 2009 COOPEMILICH Agreement and the compensation and relocation accords that were reached under that agreement.  Each miner that vacated the mining area was compensated per the agreements.

40.     **Gonzalez Lopez** (and **Gonzalez Guzman**, **AURUM**, and **Kauffmann**) unlawfully remained at Jackson Tunnel even though **Gonzalez Lopez** was a member of COOPEMILICH and an active member who authorized COOPEMILICH to negotiate the 2017 compensation accord and the 2017 relocation accord.

**E.     B2Gold Learns in November 2017 that Gonzalez Lopez and Gonzalez Guzman, Among Others, Are Operating an Illegal Commercial Mine at Jackson Tunnel**

41.     On or about November 13, 2017, B2Gold received an email attaching a letter dated October 2017 from **Gonzalez Lopez** directed to Omar Vega, an engineer and Country Manager for B2Gold.  In that letter, **Gonzalez Lopez** informed B2Gold of his commercial subterranean mining operation.  **Gonzalez Lopez** claimed he had extensive documentation from COOPEMILICH recognizing that he was the owner of a mining operation known as Jackson Tunnel located within the Concession and within the 1% concession allowed by Nicaraguan law.

42.    **Gonzalez Lopez** claimed that he had been working the Jackson Tunnel mine since he retired and many years before B2Gold came to Nicaragua.  He said that he was the only small miner in La Libertad who had an industrial operation.  He said that his mining operation used compressors, pneumatic drills, and diamond drill holes for small blasting.  He said that his tunnel had been reconstructed and reinforced and had a railway line on which a small mining cart circulated to bring the ore to a station and then to the surface.

43.    **Gonzalez Lopez** claimed that he sold his ore to a company called MLR – Plantel Los Angeles and that his mining operation was in full production.  He said that he had many investments over the years on equipment purchased from the United States.

44.    **Gonzalez Lopez** continued to state that, in the several days since the compensation of "almost 700 small miners" who used to mine the area, B2Gold had started mining the surface area with its machinery.  **Gonzalez Lopez** said that B2Gold's surface operations had caused two small tunnel collapses.  He said his workers were scared of being trapped in the tunnel by further collapses caused by B2Gold's machinery.  He said that his operation was the only functioning subterranean mine in La Libertad.

45.    **Gonzalez Lopez** warned that if the tunnel were to collapse because of the vibrations caused by B2Gold's machinery and cause a loss of life, then the ensuing scandal would reach the entire country.

46.    **Gonzalez Lopez** ended his letter by requesting a meeting with B2Gold to find a negotiated solution to this problem.

47.    Two days later, on or about November 15, 2017, two B2Gold representatives visited Jackson Tunnel and spoke to the workers that were present and took photographs of the site.  **Gonzalez Lopez** was not present that day and the B2Gold employees did not go

underground to view the tunnel.

48.     On or about November 17, 2017, **Gonzalez Lopez** sent a second letter to B2Gold (directed again to Omar Vega) claiming a right to continue operating his subterranean mine.  He said that the B2Gold representatives failed to inspect the tunnel so that they could see over 1000 feet of tunnel.  He said that the tunnel was located 200 feet below the highest elevation on San Juan Hill.

49.     **Gonzalez Lopez** said that his tunnel was in front of one of the richest veins in La Libertad and that they had started some rich threads.  He said that they have extracted high-grade ore, enough to process or sell a few tons and make a decent living.

50.     **Gonzalez Lopez** asked B2Gold to send a geologist to take some samples and have the samples analyzed at a laboratory so that B2Gold can see that the value of the ore he and his associates were extracting from the mine is one of the richest deposits in La Libertad.

51.     **Gonzalez Lopez** claimed that he was the only miner left in the San Juan vein, as all the other miners had left and were relocated to other areas of little value after those miners had negotiated away their rights to B2Gold.

52.     **Gonzalez Lopez** claimed that he was legally continuing his mining operation because he was relying on the 1% area that the mining concession law grants artisanal miners and on the Constitution of the Republic, which protects cooperative work, in addition to having title to the land.

53.     **Gonzalez Lopez** said that Jackson Tunnel had a rich vein of 200 meters in length, 30 meters wide, and 130 meters deep.  He said the tunnel held 585 thousand cubic meters of ore with a density of 2 tons per cubic meter with a value of 4 grams per ton.   According to his calculations, Jackson Tunnel held more than one million tons of ore, equivalent to 160 thousand

troy ounces of gold. **Gonzalez Lopez** ended his letter by stating that he was open to dialogue and understanding.

54.     On or about November 24, 2017, Carlos Andres Rodriguez Cruz, a representative of B2Gold, sent a letter to the Ministry informing the Director General of Mines Carlos Zarruk of the content of the November 13, 2017 letter received from Gonzalez Lopez. Rodriguez Cruz stated that the letter was the first time that B2Gold had heard of the Jackson Tunnel as a commercial mining operation. Rodriguez Cruz said that the representations **Gonzalez Lopez** made in the letter about the Jackson Tunnel mining operation suggested that mining operation did not comply with the laws governing small miners and artisanal miners.

55.     Rodriguez Cruz further stated that he sent a team to Jackson Tunnel to collect information and take some photographs of the site to verify what **Gonzalez Lopez** said in the letter. The team met with two workers who said the collapses were caused by the rain and the team took photographs of the site.

56.     Rodriguez Cruz also discussed the November 17, 2017 letter that he received from **Gonzalez Lopez**. Rodriguez Cruz then provided both **Gonzalez Lopez** letters and the photographs to the Ministry.

57.     Rodriguez Cruz then requested that the Ministry inspect Jackson Tunnel and take all actions that are necessary to ensure compliance with all the mining laws.

58.     On or about December 6, 2017, the Ministry inspected Jackson Tunnel. The inspectors were met by **Gonzalez Lopez** and were accompanied by B2Gold representatives. The inspectors found within the boundaries of B2Gold's real property and on the surface a shed, an 80-psi compressor, a container for housing tools, and a small plant for processing minerals that was about 90% complete. The inspectors inspected the tunnel and found it to be 1362-feet long,

six-feet high, six-feet wide, and supported by wooden beams. The inspectors also noted, according to information provided by Plantel Los Angeles S.A, a processing company, that Gonzalez Lopez supplied Plantel Los Angeles S.A., with 35.673 tons of deposits that yielded 9.778 ounces of gold in 2017.

59.     At the conclusion of the inspection, the Ministry inspectors requested that **Gonzalez Lopez** provide title to the property and the authorization from the concession holder allowing artisanal mining and small mining in the area where the mine is located.  The Ministry inspectors further noted that the Concession holder B2Gold (through DESMINIC) presented title to the land where the Jackson Tunnel was located and two drawings showing that the tunnel was located on B2Gold property and within its Concession.

60.     On or about January 25, 2018, Rodriguez Cruz petitioned the Ministry and the Director General of Mines Carlos Zarruk on behalf of B2Gold (through DESMINIC), requesting that the Ministry issue a resolution confirming:

    a.    that the mining area denominated and identified as La Libertad in the ministerial agreement was duly granted to and is registered in favor of B2Gold (through DESMINIC) and that this grant gives B2Gold the exclusive rights to the exploration, exploitation, and establishment of plants to recover the mineral deposits existing in the Concession;

    b.    that, pursuant to the Ministry's December 6, 2017 inspection of  Jackson Tunnel, the only one who continues to mine within the Concession with the help of workers is **Gonzalez Lopez**;

    c.    that, pursuant to the Ministry's December 6, 2017 inspection of Jackson Tunnel, **Gonzalez Lopez** does not have any permission from B2Gold (through DESMINIC), the Concession holder of the area in which Jackson Tunnel is located, to carry out any artisanal mining at Jackson Tunnel, and that **Gonzalez Lopez** is in flagrant violation of the mining laws;

    d.    that, pursuant to the Ministry's December 6, 2017 inspection of Jackson Tunnel and **Gonzalez Lopez's** own statements, **Gonzalez Lopez** is deemed a small industrial miner (not an artisanal miner) making use of explosives, drills, and a plant for processing ore in flagrant violation of the mining laws;

e.      that B2Gold (through DESMINIC) has all the necessary licenses and permits to mine La Libertad and that **Gonzalez Lopez's** mining operations without any authorization of B2Gold (through DESMINIC) affects B2Gold's mining operations in La Libertad and that **Gonzalez Lopez's** actions are in flagrant violation of the mining laws;

f.      that, pursuant to the Ministry's December 6, 2017 inspection of Jackson Tunnel and **Gonzalez Lopez's** own statements, **Gonzalez Lopez** has been mining Jackson Tunnel as a commercial mining enterprise for over five years in flagrant violation of the mining laws;

g.      that B2Gold (through DESMINIC) entered into the 2009 COOPEMILICH Agreement with COOPEMILICH; that the agreement was recorded with the Ministry; that the 2009 COOPEMILICH Agreement stated, in part, that "in the event that DESMINIC had an interest in extracting ore in some of the areas where some of the authorized groups were operating, DESMINIC, agrees to give notice six months in advance, the cooperative will ensure that said group leaves the site of extraction in an efficient and immediate way, respecting the periods authorized in this agreement";  and that **Gonzalez Lopez**, as a member of COOPEMILICH, was in flagrant violation of the 2009 COOPEMILICH Agreement;

h.      that the 2009 COOPEMILICH Agreement established the parameters for compensation for relocating; that those parameters and the compensation for relocation were included and affirmed in the accord for the compensation process for relocation from the site San Juan entered into on August 8, 2017, and recorded with the Ministry; and that **Gonzalez Lopez**, being an active member of COOPEMILICH, has refused to abide by the compensation and relocation COOPEMILICH agreements by claiming exorbitant amounts other than those agreed upon in the agreements and refusing to be compensated or to relocate;

i.      that, pursuant to the Ministry's December 6, 2017 inspection of Jackson Tunnel and statements provided by Plantel Los Angeles S.A., **Gonzalez Lopez's** mining operation produced 35.673 dry tons of mineral and 9.778 ounces of gold in 2017; and that the Ministry verified that B2Gold (through DESMINIC) can continue under the compensation framework agreed with COOPEMELICH and correctly compensate **Gonzalez Lopez** according to the compensation table in the agreements and the volumes of the works inspected and reported by **Gonzalez Lopez**;

j.      that B2Gold (through DESMINIC) complied with the notice requirements for relocation contained in the 2009 COPEMILICH Agreement by sending written notice to COOPEMILICH on February 21, 2017, informing COOPEMILICH and its members of the need to relocate from the San Juan sector in six months;

k.   that B2Gold (through DESMINIC) signed an agreement on August 8, 2017, with the president and representative of COOPEMELICH, members of the COOPEMILICH board of directors, and the Commission of Miners of the sector of San Juan, entitled "Agreements for the process of compensation and transfer of the sector known as San Juan," in the presence of the mayor of La Libertad, a priest from the local Catholic church, and a delegate of the Ministry; that this agreement is in force and effect; that, in this agreement, COOPEMILICH guaranteed to vacate the San Juan site occupied by its members no later than August 20 , 2017; and that **Gonzalez Lopez**, as an active member of COOPEMILICH, is in flagrant violation of the promises and obligations contained in the agreements;

l.   that B2Gold (through DESMINIC) is in compliance with the agreement signed on August 8, 2017;

m.   that **Gonzalez Lopez** was the first president, founder, and active partner of COOPEMILICH; that **Gonzalez Lopez** has been part of the different censuses that B2Gold (through DESMINIC) has made over the years; that **Gonzalez Lopez** is included in the "Artisanal Mining Census Sheet" dated September 9, 2014 that was submitted to the Ministry; that **Gonzalez Lopez's** active status as a member of COOPEMILICH was confirmed by COOPEMILICH in a certificate it issued on December 4, 2017; and that **Gonzalez Lopez** is in flagrant violation of the promises and obligations contracted by COOPEMILICH and his obligations as a member of COOPEMILICH; and

n.   that B2Gold (through DESMINIC) is the owner of the real estate where **Gonzalez Lopez** was found, which B2Gold has proven by having submitted the title of ownership of that property.

B2Gold (through DESMINIC) also submitted numerous documents in support of its petition.

61.   On or about February 1, 2018, **Gonzalez Guzman**, under a power of attorney from **Gonzalez Lopez**, filed a petition with the Ministry on behalf of **Gonzalez Lopez** claiming that **Gonzalez Lopez**, by virtue of 50 years of being at El Jackson in good faith and "with the spirit of owner," is the owner of the property.  **Gonzalez Lopez** stated that he has been mining the property since 1992, before B2Gold (through DESMINIC) acquired its concession in 1994, and that approximately one million dollars have been invested in the mining operation over that time.  **Gonzalez Guzman**, on behalf of **Gonzalez Lopez**, wanted the Ministry to issue an order

directing B2Gold to cease its mining operations in the area.

62.      On or about February 5, 2018, the Ministry issued a resolution ("Auto Resolutivo No. 014-DGM/MEM-2018"), agreeing with all the points raised in B2Gold (DESMINIC)'s petition and finding that the mining operations by **Gonzalez Lopez** in Jackson Tunnel have been proven without any demonstration by him of the legality of his actions; that all activities in the area need to be suspended until further information is obtained and to prevent any further ground failures; and that, within six days after receiving notice of the Ministry's resolution, **Gonzalez Lopez** must provide: (i) a public deed showing his ownership interest in the property; (ii) the permission from the Concession holder to work as a small miner under the mining laws, (iii) the permission from the Ministry; (iv) the environmental prevention and mitigation plans presented and evaluated by the Delegation of Marena Chontales; and (v) any other document that **Gonzalez Lopez** believes supports his claim.

63.      On or about February 26, 2018, **Gonzalez Guzman**, on behalf of **Gonzalez Lopez**, filed objections to the Ministry's resolution claiming absolute nullity and seeking a recourse and revision of the resolution.

64.      On or about February 26, 2018, B2Gold (through DESMINIC) filed an emergency request for urgent precautionary measure of suspension of new work against **Gonzalez Lopez** with the Court in La Libertad, Chontales.  B2Gold (through DESMINIC) expressed grave concern for the safety of its workers, contractors and its mining operation in San Juan as well as for the safety of the workers of **Gonzalez Lopez**.

65.      On or about March 7, 2018, the Ministry issued a second resolution that thoroughly analyzed all of Gonzalez Lopez's objections, overruled all of them, and re-affirmed Auto Resolutivo No. 014-DGM/MEM-2018.

66.     **Gonzalez Lopez** willfully ignored Auto Resolutivo No. 014-DGM/MEM-2018 and continued his mining operations at Jackson Tunnel.

67.     On March 12, 2018, **Gonzalez Guzman**, on behalf of **Gonzalez Lopez**, filed an opposition to B2Gold's emergency request for precautionary measures with the Court in La Libertad, Chontales.  **Gonzalez Guzman** argued, among other things, that **Gonzalez Lopez** has been in possession of the land for over 50 years; that **Gonzalez Lopez** has been mining it as artisanal miner since 1992 before B2Gold (through DESMINIC) was granted the Concession; that **Gonzalez Lopez** never signed any of the COOPEMILICH agreements with B2Gold (through DESMINIC); that **Gonzalez Lopez** rejects such agreements as contrary to law; and that the fact that **Gonzalez Lopez** is a member of COOPEMILICH does not obligate **Gonzalez Lopez** to accept agreements made by COOPEMILICH because **Gonzalez Lopez** is exercising his own individual rights under the small mining laws.

68.     On or about March 15, 2018, the Court issued an order enjoining **Gonzalez Lopez** and his workers from entering illegally onto the land owned by B2Gold (through DESMINIC) and exploiting the land without authorization and in contravention of the relocation agreements between B2Gold (through DESMINIC) and COOPEMILICH.

69.     **Gonzalez Lopez**, **Gonzalez Guzman**, **AURUM**, **Christopher**, and **Kauffmann** have willfully ignored both the order of the Court and the Auto Resolutivo No. 014-DGM/MEM-2018 issued by the Ministry and are currently openly and defiantly violating both orders.   They have trespassed onto B2Gold (through DESMINIC)'s property, destroyed the fence put up by B2Gold (DESMINIC) to protect members of the community and animals from wandering into active mining areas, confronted and threatened B2Gold (DESMINIC) employees protecting the site, and have continued mining operations in violation of both orders.

**III.     Christopher and the Enterprise Turn to Threats and Defamation Against B2Gold**

      **A.     <u>First Email from Christopher Threatening Defamation</u>**

70.     On or about January 16, 2018, **Christopher**, using the email address popoyo128@gmail.com, sent an extortionate email to the investor@b2gold.com email account, which is owned and controlled by B2Gold.  The email was also sent to **Kauffman** (eakauffman@icloud.com) and **Roberto Cruz** (robertocruz942@hotmail.com).

71.     **Christopher** and **Kauffman**, **along with their confederates in the Enterprise**, agreed to send this extortionate email, among others, to Plaintiffs.

72.     The email was "directed towards Chief Counsel [of B2Gold], Roger Richer."

73.     **Christopher** began the email by stating that his "team" has experience "crush[ing] criminals" at his beachfront property in Nicaragua.

74.     **Christopher** identified himself as a "significant shareholder" in **AURUM** and claimed that **AURUM** owns a 60% interest in the mine at Jackson Tunnel.  **Christopher** also identified **Gonzalez Guzman** as a "significant shareholder" in **AURUM.**

75.     **Christopher** falsely accused B2Gold of various crimes in Nicaragua and stated that he would "attend the next shareholder annual if necessary to explain to all shareholders current B2Gold business practices here in Nicaragua."

76.     **Christopher** also threatened, "I . . . would be almost certain that your [B2Gold's] behavior here would cause the NYSE [New York Stock Exchange] to consider delisting you. While not as familiar with the TSE [Toronto Stock Exchange], I bet it would take a similar dim view of your practices here."

77.     **Christopher** told B2Gold to "expect a war" and to expect "a vicious social media campaign designed to lower [B2Gold's] share price."

78.     **Christopher** invited B2Gold to "negotiat[e]" purchasing Jackson Tunnel from

**AURUM**. **Christopher** (falsely) estimated that "there may be as much as a billion dollars of gold there at today's price."

79.     Before **Christopher** would "negotiat[e]," however, he suggested that "B2Gold [had to] get [its] f.ckin' thug lawyers and other scum bags off the backs of *our team members, the Gonzalez family, the Kauffmann family and anyone constructively associated with the Jackson*." (emphasis added).

80.     **Christopher** closed the email stating, "I have a special way of treating bullies.  And an equal and opposite manner for my friends.  Lets pursue the friendly path which will ultimately be more profitable for all parties anyway."

81.     **Christopher** signed the email as President of **Flor** and as a shareholder in **AURUM**.

82.     B2Gold did not give into the extortionate demands because the Enterprise's allegations were false, misleading, unfounded, and scurrilous.  B2Gold (through DESMINIC) also already owned the property where Jackson Tunnel was located and the exclusive mining rights in that region.

**B.     Christopher and the Enterprise Mount a Campaign Threatening Plaintiffs with Defamation and Violence**

83.     Following **Christopher's** initial email and threats to B2Gold**, Christopher** has made good on his threat of "war."

84.     Since January 2018, **Christopher**, acting on behalf of the Enterprise, has sent over 50 threatening and extortionate emails to Craig.

85.     **Christopher's** emails to Craig have become increasingly threatening over time and have included threats of violence against Craig.

86.     **Christopher** explicitly threatened or strongly implied that the Enterprise would

take the following actions, among others:

     a.     Send a false and defamatory report to B2Gold's top shareholders in the United States and elsewhere.

     b.     File false and defamatory reports with the New York Stock Exchange, the United States Securities and Exchange Commission, the Toronto Stock Exchange, United States Immigration and Customs Enforcement, the United States Department of Justice, the United States Embassy in Nicaragua, and the Canadian Embassy in Nicaragua, among other institutions.

     c.     Defame B2Gold to its "creditors."

     d.     Begin a "global media campaign to discredit [B2Gold]."

     e.     Distribute a false and defamatory report about B2Gold to a United States Circuit Court judge and United States Senators.

     f.     Cause a "50% one day stock decline" in B2Gold's share value.

     g.     "Fuck [B2Gold] out of five billion dollars."

     h.     "[C]ome after [B2Gold] in Canada and the U.S."

     i.     "[S]tart a political fire . . . ." ("B2Gold built it and we are going to light it up!").

     j.     File false and defamatory lawsuits against B2Gold in the United States, Canada, Nicaragua, and "hell maybe even the Court of the Hague."

     k.     Initiate "dozens if not hundred[s] of cases . . . that have nothing to do with [the Enterprise's illegitimate] claim [to Jackson Tunnel]."

     l.     Make B2Gold's "life hell for the next five years."

     m.     "Com[e] for [B2Gold] in every direction possible."

     n.     Kill or injure Craig and other B2Gold executives.

     o.     Travel to Vancouver and/or hire someone to kill or injure Craig and other B2Gold executives.

     p.     Incite a "gold miner revolt."

     q.     Meet with a Nicaraguan Supreme Court Justice to have the Concession revoked from B2Gold.

87.     Throughout these emails, **Christopher** identified that he and/or his associates are working with:

        a.     **AURUM**

        b.     **Gonzalez Lopez**

        c.     **Gonzalez Guzman**

        d.     **the "entire Gonzales Family"**

        e.     **Kauffman**

        f.     **Emilio Alfredo Kauffman Lopez**

        g.     **Darwin Kauffman**

        h.     **Roger Kauffman**

        i.     **the "entire Kauffman family"**

        j.     **and unspecified others.**

88.     Based on **Christopher's** own statements and the IP addresses associated with the emails, **Christopher** sent these emails from Arlington, Virginia; Florida; Kansas; Texas; Colorado; and Nicaragua, among other places.

89.     Among the emails that **Christopher** sent from Arlington, Virginia, were emails wherein **Christopher** threatened to kill or injure Craig.  Attached to two of these emails were photographs of dead bodies face down in blood.

90.     **Christopher** used his popoyo128@gmail.com email address to send each of these emails.

91.     The following table describes most of the emails Christopher sent to B2Gold or Craig in reverse chronological order:

| Date (on or about) | Description and Highlights |
|---|---|
| August 22, 2018 | In the email, **Christopher** falsely accuses B2Gold of leading and |

| | |
|---|---|
| | financing a massacre at "Lovago."   **Christopher** attempts to extort B2Gold on behalf of the Enterprise, stating, "The offer now is $20 mil cash, 4 mil shares, 10mil warrants. Given your share price performance we require strike price below $3 now."  **Christopher** then threatens to defame B2Gold to United States authorities, stating, "I spend all next week in DC. I would prefer Lovago not be on my agenda." |
| August 9, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame and falsely accuse B2Gold, Craig, and other B2Gold executives of crimes.  **Christopher** threatens to take these actions in meetings he has scheduled with officials at various federal agencies, including the United States Department of State. **Christopher** states that Craig, among other B2Gold executives, can spend the rest of his life in jail or "we [the Enterprise] can be [B2Gold] share and warrant holders cheering on your success." |
| August 8, 2018 | In the email, **Christopher**, on behalf of the Enterprise, demands that B2Gold give the Enterprise $15 million dollars and 4 million shares, among other demands. **Christopher** also suggests that he, **members of the Enterprise**, and/or B2Gold sign "NDAs"<br><br>Attached to the email is a document that appears to be a fabricated news article or press release falsely accusing "NYSE listed firm (BTG) B2Gold" of serious crimes. |
| August 3, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring legal actions against B2Gold in the United States and Canada unless B2Gold "settles" with the Enterprise. |
| July 25, 2018 | The email contained only a picture of a body face down in blood. |
| July 24, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs and distribute the Spectre Report to more people unless Plaintiffs pay the Enterprise millions of dollars. |
| July 20, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to falsely accuse Plaintiffs of serious crimes.  **Christopher** also states that the "US Dept.of.State now has [Craig] on the research list for mobility and financial sanctions" and that "[w]e got more gifts coming your way." |
| July 5, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs and kill or injure Craig. |
| June 22, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs and kill or injure Craig and other alleged B2Gold employees.<br><br>The email also contains a picture of a dead boy face down in blood in the street. |

| | |
|---|---|
| June 6, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs and falsely accuse them of crimes. **Christopher** threatens, "150 institutional investors receive the [Spectre Report] early next week.....the top shareholders in your scumbag firm." |
| May 12, 2018 | In the email, **Christopher**, on behalf of the Enterprise, **threatens,** "You cannot imagine the hell we are unleashing on you next week." |
| May 12, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to have Craig "jailed." |
| May 8, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs and have B2Gold's Concession "cancelled." |
| May 7, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs. |
| May 2, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold. |
| April 24, 2018 | In the email, **Christopher**, on behalf of the Enterprise, states that he is "gunning hard to f.ck [B2Gold] up." |
| April 24, 2018 | In the email, **Christopher**, on behalf of the Enterprise, states, "Lights are shining and cockroaches are running." |
| April 17, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens that the Enterprise will bring legal actions against B2Gold unless B2Gold accedes to the demands of the Enterprise. |
| April 13, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame Plaintiffs to a Canadian Agency. |
| April 13, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold and bring legal actions against B2Gold. **Christopher** further threatens, "We are certain you are not yet really thinking that we can reach you in North America.  I wll continue to ask you if that is a bet you really want to make." |
| April 4, 2018 | In the email, **Christopher**, on behalf of the Enterprise, states it is his "life.mission to.fuck [B2Gold] out of five billion dollars." |
| April 4, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold. |
| April 4, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens that the Enterprise will bring legal actions against Plaintiffs. |
| April 4, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens Craig, saying: "[R]ecall I am a US citizen with a passport.  You can |

| | |
|---|---|
| | be a hero or a hunted deer." |
| April 3, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens legal actions against Plaintiffs. |
| April 3, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens: "You wanted a war ....so.you have a war!" |
| March 26, 2018 | In the email, **Christopher**, on behalf of the Enterprise, says he is Craig's "worst nightmare" and that it is his "lifes mission now to completely f.ck [Craig]." |
| March 26, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold and initiate legal actions unless B2Gold pays the **Kauffmanns** "$100 million now." |
| March 23, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold and initiate legal actions against Plaintiffs.<br><br>**Christopher** also threatens:<br><br>"Dale, do you like violence.  You seem intent on formenting violence.  But you think you are exempt from the consequences.  Maybe you are not.  Remember the Golden Rule....do unto to others as you would have them do unto you..... the first time one of your actions causes physical harm to someone here I will consider you personally responsible. I have a passport.I like visiting Vancouver. Maybe we run into to each other for a beer or something." |
| March 21, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold and file actions and complaints against B2Gold with United States authorities. |
| March 15, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens, "[W]e have barely begun our attacks on you." |
| March 14, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold "to major shareholders by June or sooner." **Christopher** also threatens, "[Y]our time.to resolve this quietly is running out." |
| March 9, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens, "Good luck with your eviction notice. . . . [I]t will.cost you $500 million potentially." |
| March 7, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens, "We are coming after you in ways you seem to arrogant to consider possible." |
| February 26, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring legal actions against B2Gold. |

| February 21, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring legal actions against B2Gold. |
| February 13, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens, "We are going to make your life hell for the next five years or you can have a new partner for a new paradygm of real reponsible mining in Nicaragua **. . . ."** |
| February 12, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold to its creditors, "the exchanges," and the "US and Canadian SECs." |
| February 9, 2018 | Attached to the email is photograph of protestors. |
| February 6, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring "dozens" of court actions against B2Gold and threatens, "We advance everyday against you." |
| February 2, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold to the SEC and NYSE.  **Christopher** also threatens, "If we fight it lasts a decade and could cost your firm several hundred million or more." |
| January 31, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring legal actions against B2Gold in the United States and Canada. |
| January 31, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold in "a global social media campaign as well as using the national media here." |
| January 29, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to bring baseless legal actions against B2Gold in Nicaragua. |
| January 25, 2018 | In the email, **Christopher**, on behalf of the Enterprise, attaches a picture of himself and other **co-conspirators** and threatens, "Just in case you think this is not really happening." |
| January 25, 2018 | In the email, **Christopher**, on behalf of the Enterprise, falsely accuses B2Gold of crimes and threatens "the clock is ticking" to negotiate with the Enterprise. |
| January 24, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens bring  legal actions against B2Gold in the United States and defame B2Gold to the NYSE and the SEC. |
| January 23, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens a "gold miner revolt" unless B2Gold "negotiate[s]." |
| January 21, 2018 | In the email, **Christopher**, on behalf of the Enterprise, falsely accuses B2Gold of crimes and threatens, "You can pay us 2-4% of estimated non assessed value or 100% plus treble damages and of |

|  | course, probably see your share price tumble and risk potential delisting." |
| January 19, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens to defame B2Gold to the TSE and NYSE. |
| January 16, 2018 | In the email, **Christopher**, on behalf of the Enterprise, threatens B2Gold as described in Paragraphs 70 through 81. |

### C. Christopher Follows Through With His Threats of Defamation and Threatens Further Defamation

92.     **Christopher** and others acting on behalf of the Enterprise created a materially false, scurrilous, and defamatory report claiming, among other things, that B2Gold was involved in "a criminal conspiracy to defraud Nicaragua of her gold wealth" (The "Spectre Report").

93.     **Christopher** and others in or associated with the Enterprise, with the intent to deceive and obtain money from B2Gold, devised a scheme and artifice to defame B2Gold and defraud B2Gold's shareholders and investors with The Spectre Report.

94.     **Christopher** and others in or associated with the Enterprise fraudulently constructed The Spectre Report to appear to be a legitimate report prepared by an independent third-party expert.

95.     In or about June 2018, **Christopher** and others in or associated with the Enterprise did in fact knowingly, voluntarily, and intentionally begin disseminating the materially false, misleading, and defamatory Spectre Report using interstate and foreign wires, including email and social media:

      a.    In or about June 2018, **Christopher** transmitted The Spectre Report, or caused the report to be transmitted, over interstate wires to at least two B2Gold investors in Dallas, Texas.

      b.    Based on **Christopher's** own statements, the IP addresses associated with Christopher's emails, and the June 1, 2018 completion date on The Spectre Report, **Christopher** transmitted the report, or caused the report to be transmitted, using interstate wires while he was present in the Eastern District of Virginia.

27

      c.     Based on **Christopher's** own statements, others in the Enterprise also transmitted The Spectre Report, or caused the report to be transmitted, via interstate or foreign wires to other individuals, entities, and B2Gold investors.

96.     The Spectre Report, dated June 1, 2018, is titled "Trafficking of Mineral Concessions: A Criminal Conspiracy to Defraud Nicaragua of her Gold Wealth."  The Spectre Report falsely stated that it was "prepared for" **AURUM** by **Spectre Associates**.  However, the electronic document properties, which are metadata not visible in the text, for The Spectre Report show "**Philip Christopher**" as the author of the document.  **Christopher** and, on information and belief, others acting on behalf of the Enterprise participated in the creation of The Spectre Report.

97.     The Spectre Report purports to "describe and detail the processes and machinations of the extensive criminal conspiracy designed to defraud the nation of Nicaragua of its greatest physical wealth, her gold."  Every page of The Spectre Report states:

> "This document is based on research performed by **Spectre Associates** and delivered to clients, the **AUREM SA** ownership team of El Jackson mine in La Libertad, Chontales. Information contained herein was gathered over the past several years from research of legally registered documents in Nicaragua and interviews of persons knowledgeable of land and concession trafficking activities in the region of La Libertad, Chontales, Nicaragua.  This report is the result of these investigations and analysis." (bold emphasis added).

98.     In The Spectre Report, **Christopher** and others associated with the Enterprise made the following materially false, scurrilous, and defamatory statements regarding Plaintiffs:

> a.     "Then, the highly specific example of the 'El Jackson' mine in La Libertad will serve to describe and highlight many of the tactics and strategies of the international miners and their Nicaraguan associates…Suffice it to say the manner used by B2Gold and her Nicaraguan owned subsidiary, DESMINIC in La Libertad and Santa Domingo, Chontales can be described as criminal in every way. Extortion, Coercion, Usurpation, Threats are words that accurately describe the activities of B2Gold and its operators. Bribery is applied liberally on a

massive scale to include judges, police, government accountants and more. This is a conspiracy that goes from the pueblo and campo to the Secretaria, Assembla, CSJ and, of course, the Ministry of Energy and Mines (MEM)."

b. "Even B2Gold admits in their own documents that the percentage of revenue paid as TAXES IS ONLY 5%."

c. "Most of the numbers we will quote going forward in this report are drawn directly from the Chontales NI 43-101."

d. "Source: B2Gold NI 43-101, dated March 27, 2015."

e. "B2Gold did not want to let on just how much gold was actually there in Chontales. B2Gold, most likely with the willing help of MEM, appears to have dramatically understated the resource."

f. "So B2Gold may be understating production by a factor of three or four times."

g. "For years, the production in La Libertad for B2Gold has been reported in their SEC documents as roughly $800,000 per day, but our intelligence gathering consistently informs us that they are producing $1.2 million."

h. "A final point of discussion concerning the national instrument produced by B2Gold, their firm is not a sophisticated deep resource miner, but are more so just bulldoze managers, ie surface ore extractors. Thus they produced an NI for surface material extraction that only goes to a depth of 400 meters"

i. "B2Gold may be understating production by three fold and ignoring a resource within the exact veins measured in their NI that may be five, six seven times bigger. In other words, the numbers we will now share specifically might be in reality 15 to 20 times larger ( 3 * 6 ) than B2Gold is showing in their NI."

j. "B2Gold, we estimate almost doubles the real costs in their SEC reporting to make the mine appear less profitable then it is actually is."

k. "If costs have say doubled or a bit more, but efficiencies have been almost 100%, then costs should be almost unchanged, but B2Gold reports all-in costs of $1100 per ounce. $700 to 800 would be far more believable. Over-reporting costs allows B2Gold to hide the costs of their bribery and graft from the international finance community and the Securities & Exchange Commissions (SECs) of the US and Canada."

99. The Spectre Report identifies Craig as a "primary co-conspirator" and states: "Mr

Craig, Canadian citizen, is either directly involved as senior manager of the conspiracy or is choosing to pretend he does not know. We favor directly involved, although probably rarely or never interacts with top Sandinistas."

100.    The Spectre Report then identifies other "primary co-conspirators" who purportedly either work for, or on behalf of, B2Gold:

       a.    "Omar Vega, functional President of DESMINIC SA. Reports to Zarruk and Craig. Distributes bribes and pay-offs, manages thru others coercion and threats."

       b.    "Carlos Barberena, Chief Operating Officer of DESMINIC. Reports to Vega and Zarruk. Designs and implements policies to repress the [Small Miners Community ("SMC")]."

       c.    "Denis Quintanilla, Head of Security for DESMINIC and B2Gold. Implements armed invasions and other dirty tricks against SMC. Reports to Barberena."

       d.    "Raul Novoa, attorney for DESMINIC and B2Gold. Reports to Vega and Barberena. Acts as repression agent to SMC at the legal system level."

       e.    "Alejandro Bermudez, attorney for DESMINIC and B2Gold. Leads local conspiracy to suborn courts and police. Lead local repression agent, particularly for violating civil rights of SMC. Reports to Omar Vega & Dr Novoa."

       f.    "Ivan Lara, DESMINIC, reports to Mr Vega. Mr Lara leads coercion efforts in the Chontales region for B2Gold & DESMINIC. Works with local police and when needed riot police to intimidate and even physically attack small miners."

       g.    "Erasmo Rivas Aruaz, head of workers union for B2Gold/DESMINIC. Key repression agent to SMC. Now heads para-military contingent controlling La Libertad vein. Reports to Porras, Murrillo and Vega."

101.    Each and every purported "brief role description" above is material false and scurrilous and falsely ascribes criminal and odious acts and roles on behalf of B2Gold in Nicaragua.

102.    The Spectre Report falsely states that B2Gold is the "Canadian Corporation as

prime conspirator in the El Jackson": "B2Gold – breaking US laws to include Foreign Corrupt Practices Act, RICO, Patriot and the Securities and Exchange Act.  NYSE & TSE listings should be carefully reviewed for delisting."

103.     After its list of the purported conspirators, The Spectre Report proceeds to provide a purported "brief summary of the situation and the primary tactics of B2Gold, DESMINIC and MEM," including the following materially false and defamatory statements of "fact":

a.     "Small miners are offered a small sum of money, usually less than 1/100 of one percent of fair global value for In-Ground reserves.  They are then told take the payment or the Antimotines will come and throw them off anyway and they will get nothing, except maybe some jail time.  Most take the pay off and then realize they can no longer feed their families in a week, two at most. … We believe hundred of small miners may have a legitimate claim to be restored to the land they 'sold' to B2Gold."

b.     "Families have been invited to 'community dinners' and when the men return to their claim there are B2Gold armed guards forbidding entry."

c.     "Another trick played on small miners is the land trade offer. B2Gold did this to about 30 small miners late last year.  They give them concession rights in a different area of Chontales.  The small miners are told that this land is just as rich as the land they are giving up to B2Gold. 28 of the 30 miners scammed in this gambit gave up working the new terrain almost immediately as the quality of the land they received in trade is worthless for gold extraction by artesenial methods."

d.     "And further, our intelligence coming from mill workers for B2Gold is telling us that the material B2Gold is processing is three times richer than their NI anticipated."

e.     "Visit a gold field in Nicaragua… From main street La Libertad you see a scene of the earth being vacuum cleaned around a lonely chapel left standing.  Up the road in Santa Domingo half the town is perched now on a massive open pit and B2Gold wants to move the entire town or dig under it."

104.     In a "Final Summary Review," The Spectre Report falsely states: "Nicaragua has suffered a growing conspiracy over the last 10 years to defraud the people and the government of

the patrimony of her gold.  In Chontales, B2Gold of Vancouver, Canada and her wholly owned Nicaraguan subsidiary, DESMINIC have been the primary international miners involved in the corruption against the **Kauffmann** family and hundreds of other small miners." (bold emphasis added).

105.    In or about June 2018, **Christopher** transmitted a copy of The Spectre Report, by email or some other use of interstate wires, to two different investors for B2Gold located in or about Dallas, Texas.  Based on Christopher's own statements and the IP addresses associated with his emails to Craig, **Christopher** transmitted The Spectre Report to these investors while he was present in the Eastern District of Virginia.

106.    Based on the statements of other individuals and organizations that received The Spectre Report as well as **Christopher's** own statements, **Christopher** widely distributed The Spectre Report throughout the United States and Nicaragua, and sent The Spectre Report to investors, governmental organizations, and non-governmental organizations, among others.

107.    In an August 8, 2018 email to Craig, among others, **Christopher** stated: "Today, the two documents that are attached were handed to a US District Court judge.  She will share them by weeks end with her three dear South FLA friends. two US Congress persons and a US Senator. Of course, I know who they are, can you?"  The Spectre Report is one of the two documents attached to **Christopher**'s August 8, 2018 email.  Based on Christopher's own statements in the August 8, 2018 email to Craig, **Christopher** sent the email while present in the Eastern District of Virginia.

108.    Based on **Christopher's** own statements, **Christopher** and others associated with the Enterprise also sent The Spectre Report, or caused The Spectre Report to be sent, to other B2Gold investors, individuals, and entities.

109.    **Christopher** knew that the statements referenced above in Paragraphs 92 through 107 were demonstrably and materially false, or they acted with reckless disregard of the truth or falsity of the statements, when they sent The Spectre Report to B2Gold investors and a "US District Court judge."

110.    Based on **Christopher's** own statements, **Christopher** sent The Spectre Report to B2Gold investors and a "U.S. District Court judge" with the specific intent to harm Plaintiffs' reputations, harm B2Gold's share price in the American stock market, and to discourage B2Gold's investors and other third parties from associating with B2Gold and/or Craig in an attempt to defraud and extort Plaintiffs out of, among other things, hundreds of millions of dollars.

## COUNT I:
## Defamation *Per Se* Under Virginia Law

111.    Plaintiffs reallege the facts in Paragraphs 1 through 110.

112.    **Christopher** published The Spectre Report to third parties, including, without limitation, by sending a copy of The Spectre Report by interstate wire from to, among others, two investors of B2Gold in Texas, and by sending a copy of The Spectre Report to a "US District Court judge."

113.    **Christopher** created and published The Spectre Report, at least in part, in the Eastern District of Virginia.

114.    The Spectre Report includes numerous materially false and defamatory statements that are detailed above in Paragraphs 92 through 107.

115.    The material false statements in The Spectre Report charge B2Gold with committing criminal acts, including, but not limited to, bribing public officials such as judges and police, lying in SEC reporting documents, violating the Foreign Corrupt Practices Act, and

directing, authorizing, or promoting physical attacks on Nicaraguan individuals.  The Spectre Report further imputes to B2Gold unsavory and odious business practices in Nicaragua, such as tricking "small miners" into selling their land to B2Gold for almost nothing and inviting local families to community dinners so that B2Gold could claim the families' land while that land was vacant using armed guards.

116.    Such conduct constitutes defamation *per se*, as the statements cast aspersions on B2Gold's honesty, credit, efficiency, prestige, and standing in B2Gold's field of business and American financial markets.

117.    The Spectre Report further falsely states that Craig is "senior manager of the conspiracy."

118.    Such conduct constitutes defamation *per se*, as the statement imputes the commission of a criminal offense involving moral turpitude for which Craig may be convicted, imputes a lack of integrity in the performance of Craig's duties in his job, and prejudices Craig in his profession.

119.    When **Christopher** and others in the Enterprise published The Spectre Report, **Christopher** and the Enterprise knew that the defamatory statements therein were materially and demonstrably false, or they acted with reckless disregard for their truth or falsity.

120.    **Christopher** published The Spectre Report with the intent to harm Plaintiffs' reputations and to deter third parties from associating or dealing with Plaintiffs.

121.    Plaintiffs' reputations and business have been irreparably harmed by **Christopher's** publication of the false and defamatory Spectre Report.


WHEREFORE, Plaintiffs demand judgment against Defendant Philip Christopher and in their favor for:

A.   Compensatory and other damages proximately caused by Christopher's defamation in an amount exceeding $75,000.

B.   Punitive damages for Christopher's defamation in the amount of $350,000 or the maximum available by law;

C.   Injunctive relief prohibiting Christopher or his agents from further disseminating the false and defamatory statements in the Spectre Report as set forth in paragraphs 92 to 107 or any other substantially similar false and defamatory statements;

D.   The costs of suit and reasonable attorneys' fees; and

E.   Such other relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all of their claims so triable.

Dated: September 16, 2019                          Respectfully submitted,

By _____/s/_____
Ellis L. Bennett (VSB No. 71685)
DUNLAP BENNETT & LUDWIG PLLC
211 Church Street SE
Leesburg, Va. 20175
(703) 777-7319 (*telephone*)
(703) 777-3656 (*facsimile*)
ebennett@dbllawyers.com

Stephen D. Graeff (VSB No. 77720)
DUNLAP BENNETT & LUDWIG PLLC
8300 Boone Boulevard, #550
Vienna, VA 22182
(703) 777-7319 (*telephone*)
(703) 777-3656 (*facsimile*)
sgraeff@dbllawyers.com

RJ Zayed (admitted *pro hac vice*)
John Marti (admitted *pro hac vice*)
Erin Kolter (admitted *pro hac vice*)
Michael Brey (admitted *pro hac vice*)
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402
(612) 340-2600 (*telephone*)
(612) 340-2868 (*facsimile*)
zayed.rj@dorsey.com
marti.john@dorsey.com
kolter.erin@dorsey.com
brey.michael@dorsey.com

*Attorneys for Plaintiffs B2Gold Corp. and Dale Alton Crai*g

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 16, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such electronic filing to all counsel of record.  I FURTHER CERTIFY that on September 16, 2019, a copy of the foregoing document was sent, via first class mail, to the following defendant at his last known address:

> Philip Bryson Christopher
> 6197 Railroad Ave.
> Crozet, VA 22932

> /s/
> _____
> Ellis L. Bennett (VSB No. 71685)
> DUNLAP BENNETT & LUDWIG PLLC
> 211 Church Street SE
> Leesburg, VA 20175
> (703) 777-7319 (*telephone*)
> (703) 777-3656 (*facsimile*)
> ebennett@dbllawyers.com