UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| B2GOLD CORP., *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-1202 (TSE/IDD) |
| | ) |
| PHILIP BRYSON CHRISTOPHER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court on the Motion for Default Judgment from B2Gold, Corp. and Dale Craig ("Plaintiffs") against Philip Bryson Christopher, ("Defendant"), pursuant to Federal Rule of Civil Procedure 55(b)(2). Plf. Mot. for Default J., ECF No. 35. After Defendant or a licensed attorney for the Defendant failed to appear at the hearing on November 1, 2019, the undersigned Magistrate Judge took this matter under advisement to issue this Report and Recommendation. Upon consideration of the Complaint, Plaintiffs' Motion for Default Judgment, and the memorandum thereto, the undersigned Magistrate Judge makes the following findings and recommends that default judgment be entered against Defendant.

**I. INTRODUCTION**

On September 20, 2018, Plaintiffs filed this action under 28 U.S.C. § 1964 for claims arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*. Compl. ¶ 10, ECF No. 1. On January 23, 2019, Plaintiffs filed a Motion for Default Judgment against several defendants, which was denied on August 26, 2019, as to conspiracy to violate RICO under 18 U.S.C. § 1962(d) and the Court declined to exercise supplemental

1

jurisdiction over the defamation *per se* claim. Mot. for Default J., ECF No. 23; Order Den. Mot. for Default J. ECF No. 30.

Plaintiffs then filed their First Amended Complaint ("Amended Complaint") on September 16, 2019, against Defendant alleging defamation *per se* under Virginia Law. Am. Compl. ¶ 2, ECF. No. 31. After Defendant failed to respond to Plaintiffs' Amended Complaint or appear at any proceedings in this matter, Plaintiffs moved for default judgment against Defendant on October 15, 2019. ECF No. 35.[1] Plaintiffs seek an amount exceeding $75,000 in compensatory damages, $350,000 in punitive damages under Va. Code § 8.01-38.1, attorney's fees and costs, and injunctive relief. Mem. of Law in Supp. of their Mot. for Default J. Against Philip Bryson Christopher, ECF No. 36 [hereinafter "Mem."]. The undersigned Magistrate Judge took the matter under advisement to issue this Report and Recommendation.

### A. Jurisdiction and Venue

For a court to render default judgment over a party, it must have subject matter and personal jurisdiction over the party and be the appropriate venue for the action. Although this case is based on a state-law defamation claim, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of Canada and domiciled there, Defendant is a citizen of the United Sates and domiciled in Virginia, and the amount in controversy exceeds $75,000. Am. Compl. ¶ 6.[2]

Venue is appropriate in this district pursuant to 28 U.S.C. §§ 1391(b)(2)-(3) because the events and actions giving rise to the claims asserted occurred in this judicial district. Am. Compl.

---

[1] On December 6, 2019, Defendant filed a document titled a "Response to Plaintiff request for Summary Default Judgment" (ECF No. 39), which did not state anything about answering the Amended Complaint nor requesting an extension of time to respond to the Complaint. Since Defendant has not responded to the Amended Complaint, the undersigned finds that Defendant has failed to defend. *See* FED. R. CIV. P. 55(A).

[2] *See Jacobe v. Arthex, Inc.*, No. 3:11CV821, 2012 WL 1752410, at *2 (E.D. Va. May 16, 2012) (stating "that courts look to the amended complaint to determine jurisdiction." (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007))).

¶ 8.

This Court has personal jurisdiction over Defendant because he is a citizen of the United States and is domiciled in the Commonwealth of Virginia, thus *in personam* jurisdiction is appropriate. Am. Compl. ¶ 7.

### B. Service of Process

Federal Rule of Civil Procedure 4(e) governs service upon an individual and allows service by "delivering a copy of the summons and of the complaint to the individual personally. . . ." FED. R. CIV. P. 4(e). On October 5, 2018, Defendant was served with the Complaint and Summons at his residence located in Crozet, Virginia 22932. Proof of Serv., ECF No. 4. Since the Amended Complaint does not assert any new claims for relief against Defendant, service of the Amended Complaint was not required under Rule 5. *See* FED. R. CIV. P. 5(a)(2). However, Plaintiffs served Defendant again by first-class mail on September 16, 2019. ECF Nos. 31-37. Accordingly, the undersigned finds that service on Defendant was therefore proper.

### C. Grounds for Default

Plaintiffs filed their Amended Complaint on September 16, 2019. Am. Compl., ECF No. 31. Defendant failed to file an answer or any responsive pleading in this matter. On October 11, 2019, the Clerk entered default against Defendant upon Plaintiffs' Request for Entry of Default. ECF Nos. 32-34. On March 15, 2019, Plaintiffs filed a Motion for Default Judgment and the Court held a hearing on the matter on November 1, 2019. Plf. Mot. for Default J., ECF No. 35; Mot. for Default J. Hr'g, ECF No. 38. After Defendant failed to appear at the hearing, the undersigned Magistrate Judge took this matter under advisement to issue this Report and Recommendation.

## II. FACTUAL FINDINGS

In 2009, after a series of mergers and acquisitions, Plaintiff B2Gold acquired mining rights

and assets of a concession ("Concession") located in Nicaragua that was privatized by the Nicaraguan government in the 1990s. Am. Compl ¶¶ 19-23. Plaintiff B2Gold holds the rights to the Concession and real property in La Libertad, Nicaragua, which was awarded by the Nicaraguan government. Am. Compl. ¶ 23. These rights include the right to prohibit any other commercial mining operations within the Concession. Am. Compl. ¶ 25. After the privatization, the Nicaraguan government allowed certain artisanal miners to continue limited mining operations in La Libertad, however, they could only use hand methods to mine. Am. Compl. ¶ 24. They were not allowed to hire employees, use mechanized equipment, drill, or blast. *Id.* Artisanal miners also have a one percent (1%) right to the Concession, but the areas that they are allowed to work in are subordinate to the rights of the Concession owner. Am. Compl. ¶ 25.

Plaintiff B2Gold entered into an agreement ("Agreement") with an artisanal mining cooperative known as the Cooperativa de Producción de Pequeños Mineros de La Libertad Chontales, R.L. ("Coopemilich"). [3] *Id.* Under the Agreement, artisanal miners agreed to relocate to different mining areas within the Concession if they were compensated and had six months' notice to vacate the area. Am. Compl. ¶ 27. The Agreement also expressly recognized that Plaintiff B2Gold retains priority rights within the Concession as provided under Nicaraguan law and that Coopemilich's power to assign areas to artisanal miners is subordinate to Plaintiff B2Gold's concession rights. *Id.*

Plaintiff B2Gold owns the real property located at Jackson Tunnel in the San Juan region of La Libertad. Am. Compl. ¶¶ 29-30. At the time of the Agreement, Gonzalez Guzman and Gonzalez Lopez, members of Coopemilich, held artisanal mining rights at the Jackson Tunnel and were bound by the Agreement. Am. Compl. ¶¶ 29, 31-32. Once the Agreement was in effect, they

---

[3] Cooperatives retain the power to assign artisanal miners the rights to mine an area to the exclusion of other artisanal miners, however, they are subordinate to the rights of the concession holder. Am. Compl. ¶ 26-27.

began purporting to sell possessory real property and mining interests in the Jackson Tunnel. Am. Compl. ¶ 32. However, Gonzalez Lopez only had the right to work at the Jackson Tunnel as an artisanal miner and had no possessory right to sell the real property interest, mining interest, or any other interest in the Jackson Tunnel. *Id.*

Defendant is associated with an association-in-fact enterprise ("the Enterprise") that seeks to enrich itself by defrauding and extorting individuals and entities. Am. Compl. ¶¶ 4, 11. The Enterprise has conducted racketeering activities to unlawfully acquire money, real estate, and property rights in Nicaragua as early as 2008. Am. Compl. ¶ 12. In 2014, Gonzalez Guzman, claiming to act with power of attorney on behalf of Gonzalez Lopez, his father, entered into an agreement purporting to give AURUM, an entity of the Enterprise, interest in Jackson Tunnel. Am. Compl. ¶ 33. Under this agreement, AURUM agreed to provide logistics, machinery, equipment, tools, provisions, and inputs to mine Jackson Tunnel and to share fifty percent (50%) of the profits. *Id*. In 2015, Gonzalez Guzman, again through power of attorney and on behalf of Gonzalez Lopez, purported to transfer partial rights of ownership to Jackson Tunnel to AURUM and Edwin Alfredo Kauffmann Blandino ("Kauffmann"), President of AURUM. Am. Compl. ¶ 34.

On February 21, 2017, Plaintiff B2Gold notified Coopemilich that it intended to commercially mine the region within its Concession and the Agreement. Am. Compl. ¶ 36. In accordance with the Agreement, Plaintiff B2Gold provided Coopemilich six months' notice to vacate and compensation. Am. Compl. ¶¶ 36, 39. All the miners that belonged to Coopemilich agreed to vacate the mining area and to compensation except Gonzalez Lopez, even though he was an active member of Coopemilich. Am. Compl. ¶¶ 39-40. Gonzalez Lopez, Gonzalez Guzman, AURUM, and Kauffmann unlawfully remained at Jackson Tunnel. Am. Compl. ¶ 40.

On November 13, 2017, Plaintiff B2Gold received an email with an attachment of a letter from Gonzalez Lopez that was directed to Omar Vega, an engineer and county manager for Plaintiff B2Gold. Am. Compl. ¶ 41. In the letter, Gonzalez Lopez claimed that he had extensive documentation from Coopemilich recognizing that he was the owner of the Jackson Tunnel mining operation. *Id*. He warned that if the tunnel he was using for his mining operations were to collapse and cause a loss of life as a result of Plaintiff B2Gold's surface operations, then a scandal would "reach the entire country." Am. Compl. ¶ 45.

Three days later, Gonzalez Lopez sent a second letter to Plaintiff B2Gold, directed at Omar Vega again, claiming the right to continue operating his subterranean mine. Am. Compl. ¶ 48. Gonzalez Lopez claimed that the Jackson Tunnel had more than one million tons of ore and that he was legally continuing his operation because he was relying on the one percent (1%) area that the mining concession law grants to small miners, which protects cooperative work and title to the land. Am. Compl. ¶ 52.

On November 24, 2017, Plaintiff B2Gold sent a letter to the Nicaraguan Ministry of Energy and Mines ("Ministry") stating that Gonzalez Lopez's letter was the first time it heard that the Jackson Tunnel was a commercial mining operation. Am. Compl. ¶ 54. Plaintiff B2Gold requested that the Ministry inspect Jackson Tunnel and take all actions necessary to ensure compliance with all the mining laws. Am. Compl. ¶¶ 54, 57.

On December 6, 2017, the Ministry inspected Jackson Tunnel. Am. Compl. ¶ 58. It found mining equipment, tools, and a tunnel supported by wooden beams within the boundaries of Plaintiff B2Gold's real property. *Id.* The Ministry requested that Gonzalez Lopez provide title to the property and the authorization of the concession holder allowing artisanal mining and small mining in that area. Am. Compl. ¶ 59. The Ministry also noted that Plaintiff B2Gold, the

6

Concession holder, presented title to the land where Jackson Tunnel was located and two drawings showing that the tunnel was located on Plaintiff B2Gold's property and within the Concession. *Id*.

On January 25, 2018, Plaintiff B2Gold petitioned to the Ministry and the Director General of Mines, that the Ministry issue a resolution confirming several things: 1) that Plaintiff B2Gold has the exclusive rights to recover the mineral deposits existing in the Concession, 2) Gonzalez Lopez does not have permission from Plaintiff B2Gold, the Concession holder of the Jackson Tunnel, to carry out artisanal mining, 3) Gonzalez Lopez did not abide by the Agreement's relocation and compensation provisions, and 4) Plaintiff B2Gold is the owner of the real estate where Gonzalez Lopez was found, which was proven by having submitted title to the ownership of that property, among other things. Am. Compl. ¶¶ 60(a)-(n).

On February 1, 2018, Gonzalez Guzman, under power of attorney from Gonzalez Lopez, filed a petition with the Ministry claiming that Gonzalez Lopez is the owner of the property by virtue of fifty years of being at Jackson Tunnel in good faith. Am. Compl. ¶ 69. A few days later, on February 5, 2018, the Ministry issued a resolution ("Resolution") agreeing with Plaintiff B2Gold's petition, and that Gonzalez Lopez must provide a public deed demonstrating ownership interest in the property and other documents within sixty days. Am. Compl. ¶ 62. On February 26, 2018, Gonzalez Guzman, on behalf of Gonzalez Lopez, filed objections to the Resolution claiming absolute nullity and seeking recourse. Am. Compl. ¶ 63.

On March 7, 2018, the Ministry issued a second resolution that overruled Gonzalez Lopez's objections and reaffirmed the Resolution. Am. Compl. ¶ 65. Gonzalez Lopez ignored the Resolution and continued mining operations at Jackson Tunnel. Am. Compl. ¶ 66. In response to Plaintiff B2Gold's emergency request for precautionary measures and Gonzalez Lopez's opposition, the court in La Libertad issued an order ("Order") on March 15, 2018, enjoining

Gonzalez Lopez and his workers from illegally entering the land owned by Plaintiff B2Gold and exploiting the land without authorization. Am. Compl. ¶ 68. Gonzalez Lopez, Gonzalez Guzman, AURUM, Defendant, and Kauffmann ignored the Order and Resolution and trespassed onto Plaintiff B2Gold's property, destroyed property on the premise, threatened Plaintiff B2Gold's employees, and continued mining operations. Am. Compl. ¶ 69.

**Extortion**

On January 16, 2018, Defendant, using the email address popoyo128@gmail.com, sent an email to Plaintiff B2Gold's Chief Counsel indicating that he and Gonzalez Guzman were significant shareholders in AURUM, that Plaintiff B2Gold's behavior in Nicaragua would cause the New York Stock Exchange ("NYSE") to consider delisting it, and accusing Plaintiff B2Gold of crimes in Nicaragua. Am. Compl. ¶¶ 72, 74, 76. Defendant wrote that Plaintiff B2Gold should "expect a war" and "vicious social medial campaign designed to lower [Plaintiff's] share price." Am. Compl. ¶ 77. Defendant invited Plaintiff B2Gold to negotiate purchasing Jackson Tunnel from AURUM. Am. Compl. ¶ 78. Defendant signed the email as President of Flor de Mayo and as shareholder of AURUM. Am. Compl. ¶ 81. Plaintiffs did not give into Defendant's demands. Am. Compl. ¶ 82.

Since this initial email, Defendant, acting on behalf of the Enterprise, sent over fifty threatening and extortionate emails to Plaintiff Craig. Am. Compl. ¶ 84. Such emails consisted of killing or injuring Plaintiff B2Gold executives and Plaintiff Craig, sending defamatory reports to Plaintiff B2Gold top shareholders, filing false and defamatory reports with the NYSE, and distributing false and defamatory reports about Plaintiff B2Gold to United States Circuit Court Judges and United States Senators. Am. Compl. ¶ 91. Attached to two emails that threatened to kill or injure Plaintiff Craig were photographs of dead bodies face down in blood. Am. Compl. ¶

8

89. In these emails, Defendant indicated that his associates were all acting on behalf of the Enterprise. Am. Compl. ¶ 91.

Based on Defendant's own statements and IP address associated with the emails, the emails were sent from Virginia, Florida, Kansas, Texas, Colorado, and Nicaragua. Am. Compl. ¶ 88.

**Spectre Report**

In June 2018, Defendant authored a materially false, misleading, and defamatory report called the Spectre Report ("Report"). Am. Compl. ¶ 92. The Report claims that Plaintiff B2Gold was involved in a criminal conspiracy to defraud Nicaragua of "her gold wealth" and Plaintiff Craig is a "primary co-conspirator." Am. Compl. ¶¶ 92, 99. It also falsely states that Plaintiff B2Gold is breaking U.S. laws including the Foreign Corrupt Practices Act, RICO, the Patriot Act, and the Securities and Exchange Act. Am. Compl. ¶ 102. The Report further states that Plaintiff B2Gold was involved in corruption against the Kauffmann family and other small miners. Am. Compl. ¶ 104. Defendant and others associated with the Enterprise constructed the Report to appear to be a legitimate report prepared by an independent third-party expert and transmitted the report using interstate wires. Am. Compl. ¶¶ 94-95.

Based on Defendant's own statements, he transmitted the report to two different investors of Plaintiff B2Gold located in Dallas, Texas, while he was present in this district. Am. Compl. ¶¶ 95(a)-(b). Defendant agreed to disseminate and did disseminate the Report with intent to defraud Plaintiff B2Gold's shareholders and investors and extort Plaintiff B2Gold out of millions of dollars. Am. Compl. ¶ 110.

On August 8, 2018, Defendant sent an email to a Plaintiff B2Gold employee stating that the Report and another document were sent to a U.S. District Court judge who will share them with her friends in Florida, U.S. Congress individuals, and a U.S. Senator. Am. Compl. ¶ 107. This

email was sent while Defendant was present in this district. *Id*.

**Harassment and Destruction of Property**

In April 2018, Defendant violated the Order and Resolution of the Ministry by using chainsaws and wire cutters to destroy Plaintiff B2Gold's fences and trespass on Plaintiff B2Gold's land. Am. Compl. ¶ 129. He also harassed Plaintiff's employees in an attempt to provoke physical confrontations. Am. Compl. ¶ 130. Additionally, Defendant uploaded at least two videos of harassment and property destruction to a public YouTube accounted titled "B2Gold Nica." Am. Compl. ¶ 131. In one of the videos, Defendant intimidated guards at Jackson Tunnel and stated to his associates, "I have a rope if you want to tie these men up and subdue them." Am. Compl. ¶ 132. Defendant emailed parts of these videos to Plaintiff Craig. Am. Compl. ¶ 133.

**Defamation Claim**

Plaintiffs' Amended Complaint alleges defamation *per se* under Virginia law against Defendant. Am. Compl. ¶¶ 111-21. The Defendant published the Report to third parties by sending a copy of the Report through interstate wire to two of Plaintiffs' investors in Texas and to a U.S. District Court judge. Am. Compl. ¶ 112. The Report contains false statements alleging that Plaintiffs committed criminal acts, such as bribing public officials, and imputes odious business practices to Plaintiffs. Am. Compl. ¶ 115. Such statements constitute defamation *per se* because they cast aspersions on Plaintiffs' honesty, credit, prestige, and standing in Plaintiffs' field of business and the American financial markets. Am. Compl. ¶ 118.

### III.     EVALUATION OF PLAINTIFFS' COMPLAINT

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). A defendant in default concedes the factual allegations

of the complaint. *See, e.g.*, *DIRECTV, Inc. v. Rawlins*, 523 F.3d 318, 322, n.2 (4th Cir. 2008); *Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 341 (4th Cir. 2006); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001). Default does not, however, constitute an admission of the adversary's conclusions of law and is not to be "treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Ryan*, 253 F.3d at 780 (quoting *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Instead, the Court must "determine whether the well-pleaded allegations in [the plaintiff's] complaint support the relief sought in [the] action." *Id.*

Thus, in issuing this Report and Recommendation, the undersigned Magistrate Judge must evaluate Plaintiffs' claims against the standards of Rule 12(b)(6) of the Federal Rules of Civil Procedure to ensure that the Amended Complaint contains plausible claims upon which relief may be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining the analysis for examining a plaintiff's claims under a 12(b)(6) motion to dismiss). To meet this standard, a complaint must set forth "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining whether allegations are plausible, the reviewing court may draw on context, judicial experience, and common sense. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 679).

The elements of defamation are (1) publication of (2) an actionable statement with (3) the requisite intent. *Tharpe v. Saunders*, 285 Va. 476, 480 (2013) (citing *Jordan v. Kollman*, 269 Va. 569, 575 (2005)). The first prong—publication—requires dissemination of the statement to a third party in a nonprivileged context. *McCray v. Infused Sols.*, 2017 U.S. Dist. LEXIS 150418, at *8 (E.D. Va. Sept. 15, 2017) (citing to *Shaheen v. WellPoint Companies, Inc.,* 490 Fed. App'x 552,

555 (4th Cir. 2012)). The second element requires that the statement be both false and defamatory to be actionable. *Tharpe*, 285 Va. at 480. Statements that express only the speaker's opinion and not matters of fact are not actionable because such statements cannot be shown to be false. *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 40 (2006). If a statement is actionable, then it may constitute defamation *per se* if it: (1) imputes the commission of a criminal offense involving moral turpitude for which a party may be convicted; (2) imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of the duties; or (3) prejudices the party in her profession or trade. *Yeagle v. Collegiate Times*, 255 Va. 293, 297 n.2 (1998). Defamatory statements must be more than merely unpleasant or offensive; rather, they must make the plaintiff appear odious, infamous, or ridiculous. *McCray,* 2017 U.S. Dist. LEXIS 150418, at *9. "Corporations, as well as individuals, can be defamed *per se* by statements that cast aspersions on the target's 'honesty, credit, efficiency or its prestige or standing in its field of business.'" *JTH Tax, Inc. v. Grabert*, 8 F.Supp. 3d 731, 741 (E.D. Va. 2014).

For the final element, the requisite intent a plaintiff must prove is actual malice if punitive damages are sought. *Jordan*, 269 Va. at 576. Actual malice is defined under Virginia law to include "a statement made with knowledge that it was false or with reckless disregard of whether or not it was false." *Newspaper Publishing Corp. v. Burke*, 216 Va. 800, 805 (1976) (citing to *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). In assessing the facts of the Complaint, the undersigned finds a sufficient defamation *per se* claims against Defendant.

The first element of the defamation claim is met because the Report was disseminated to third parties—two (2) B2Gold investors in Texas and a United States District Court judge—and there is no allegation that the Report was published in a privileged manner. With regard to the second element, the claim is actionable because the statements are both false and defamatory. The

false and defamatory statements include false assertions that Plaintiff B2Gold bribed "judges, police, government accounts, and more," underreported production from its Nicaraguan mines to the SEC, and doubled the costs reported to the SEC to make the mines appear less profitable. *See* Am. Compl. ¶¶ 98(e), (f), (i), 115. The Report also contains assertions against Plaintiff Craig by alleging that he is a "primary co-conspirator" of Plaintiff B2Gold's conspiracy to defraud Nicaragua of "her gold." Am. Compl. ¶ 92. These statements constitute defamation *per se* because they impute the commission of a crime involving moral turpitude in which either Plaintiff could be convicted of a crime. Specifically, the Report contains statements that could cause Plaintiffs to be convicted of bribery, fraud, and false reporting. The Report also imputes a lack of integrity in Plaintiff B2Gold's ability to perform its corporate duties and imputes that Plaintiff Craig is unfit to perform his duties as Vice President of Operations at B2Gold Corp. These statements are not opinion; they are matters of fact because they can be shown to be false. *See Gov't Micro Res.*, 271 Va. at 40. They are also more than merely unpleasant or offensive. They allege that Plaintiffs committed serious crimes of bribery, perjury, and fraud, all which reflect an odious character on Plaintiffs. Accordingly, this claim is actionable.

Finally, Plaintiffs have properly pleaded the requisite intent of actual malice. Defendant made the statements with reckless disregard of whether or not they were false because they were trying to extort Plaintiffs of millions of dollars, harm their reputations, and attempt to defraud them. Thus, the undersigned finds that Plaintiffs have properly shown defamation *per se* against Defendant.

## IV.  REQUESTED RELIEF

In a default judgment case, the plaintiff's factual allegations are accepted as true for all purposes except in determining damages. To support a claim for damages, a plaintiff must provide

an appropriate basis for the Court to determine whether it is entitled to the relief sought. A default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c). Furthermore, in default judgment cases in this district, "there can be no recovery over the amount pled in the complaint." *Sheet Metal Workers' Nat'l Pension Fund v. Frank Torrone & Sons, Inc.*, No. 1:04-cv-1109, 2005 WL 1432786, at *8 (E.D. Va. June 1, 2005); *see also Cumberlander v. KCL Site Servs., LLC*, No. 08-994, 2009 WL 4927144, at *9 (E.D. Va. Dec. 17, 2009). However, "[t]he exact amounts for interest, costs, and attorney's fees need not be pled specifically in the complaint." *Sheet Metal Workers' Nat'l Pension Fund*, 2005 WL 1432786, at *9.

Under Virginia law, once a Plaintiff proves defamation per se, the presumption is "the plaintiff suffered actual damage to its reputation and, therefore, . . . does not have to present proof of such damages." *JTH Tax, Inc.*, 8 F. Supp. 3d 731, 741 (E.D. Va. 2014) (citing *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981); *see also Swengler v. ITT Corp. Electro-Optical Products Div.*, 993 F.2d 1063, 1070 (4th Cir. 1993) (holding that counterclaimant was not required to introduce evidence of damages for defamation claim under Virginia law). Additionally, "punitive damages may be awarded even though actual damages are neither found nor shown." *Id.* (quoting *Newspaper Publishing Corp. v. Burke*, 224 S.E.2d 132, 136 (Va. 1976). Proof of malice through "clear and convincing evidence" is required to recover punitive damages. *JTH Tax, Inc.*, 8 F. Supp. 3d at 741.

### A. Compensatory Damages

Plaintiffs seek compensatory damages and other damages proximately caused by Defendant's defamation in an amount exceeding $75,000. Am. Compl. ¶ A. Plaintiffs also sought at least $75,000 in compensatory damages in their original Complaint against six

defendants. Compl. ¶ 176(A), ECF No. 1. Since proof of actual damages suffered is not required under defamation *per se* and default judgment is sought against one defendant currently, the undersigned finds an award of $16,050 reasonable and appropriate based on the facts of the case and the Amended Complaint.

### B. Punitive Damages

Plaintiffs seek punitive damages for its defamation claim in the amount of $350,000 or the maximum available by law. Am. Compl. ¶ B. To recover punitive damages for a defamation claim, all defamation plaintiffs must show actual malice through clear and convincing proof. *Jordan*, 269 Va. at 577 (citing to *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349-50(1974)). However, punitive damages must "bear some relationship to the harm inflected . . . otherwise, it would appear to merely constitute double recovery, or be vindictive," and detract from the intended deterrent. *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 759, 762 (E.D. Va. 2009) (reducing a jury's actual and punitive damages awards by seventy five percent in a defamation *per se* suit because although defamatory statements "compromised [p]laintiff's reputation and accountability," plaintiff failed to prove that such statements were accessible to more than just a limited online community).

The undersigned finds that punitive damages are appropriate because Plaintiffs sufficiently demonstrated that Defendant made defamatory statements with actual malice. However, similar to *Cretella*, the undersigned finds that a punitive damages award of $350,000 is excessive considering Plaintiffs' lack of proof concerning monetary damage to their reputations and business, and circulation of the Report to two investors in Texas and a U.S. District Court judge. *See* Am. Compl. ¶ 121. Further, the undersigned again notes that Plaintiffs sought punitive damages in the amount of $350,000 in the first Motion for Default Judgment against six defendants. Pls.' Mem. of Law in Supp. of their Mot. for Default J. Against all Defs. ¶ C(2), ECF No. 24. Since there is only one

Defendant now pursuant to the Amended Complaint, the undersigned finds that $59,000, an approximate one-sixth recovery of $350,000, is an appropriate punitive damages award.

### C. Reasonable Attorney's Fees and costs

Although section 54(d)(2) of the Federal Rules of Civil Procedure provides for the recovery of attorney's fees and costs to the prevailing party, "fee claimants must submit documentation that reflects 'reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity,' sufficiently to permit the court to weigh the hours claimed and exclude hours that were not 'reasonably expended.'" *Guidry v. Clare*, 442 F. supp. 2d 282, 294 (E.D. Va. 2006) (quoting *E.E.O.C. v. Nutri/System, Inc.*, 685 F. Supp. 568, 573 (E.D. Va. 1988)); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A court may reduce a fee award based off a party "lumping" multiple tasks together, without specifying the amount spent on each task, because doing such is inadequate documentation. *Guidry*, 442 F. Supp. 2d at 294; *see also Am. Bird Conservancy v. U.S. Fish & Wildlife Serv.*, 110 F. Supp. 3d. 655, 675 (E.D. Va. 2015). Further, the fee claimant "must produce satisfactory 'specific evidence of the prevailing market rates in the relevant community' for the type of work for which he seeks an award.'" *Pyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987).

For the first Motion for Default Judgment, Plaintiffs filed their Supplemental Damages Submission Pursuant to Court Request on June 26, 2019. *See* ECF No. 28. The submission contains legal fees for Lawson Lundell LLP (Plaintiff B2Gold's Canadian Counsel) and Dorsey & Whitney LLP, related to matters pending before Arlington County General District Court, Arlington, Virginia, as well as legal fees "incurred by B2Gold in Nicaragua . . . as a result of

RICO violations." *See* ECF Nos. 28, 28-10 ¶ 3 , 28-1 ¶ 2, 28-11. Also, the submission contains invoices written in Spanish. *See* ECF Nos. 28-2-28-8.

The undersigned finds that Plaintiffs have "lumped" their documents together because the matters once pending before Arlington County General District Court are not relevant to the matters in the United States District Court for the Eastern District of Virginia. Nor is it clear whether the fees related to legal services in Nicaragua and the invoices written in Spanish, are at all related to the defamation *per se* claim against Defendant or are even in U.S. currency. Further, Plaintiffs have not filed any documentation showing attorney's fees under the instant Motion for Default Judgment nor have they filed evidence of the prevailing market rates in this community, the Alexandria Division of the Eastern District of Virginia. Therefore, the undersigned finds that Plaintiffs have not met their burden of submitting sufficient documentation of reasonable attorney's fee and such award is inappropriate at this juncture.

### D. Injunctive Relief

Indisputably, "an injunction is an extraordinary remedy," *Unit Owners Ass'n v. Gillman*, 223 Va. 752, 770 (1982), and it is not generally issued to restrain torts, such as defamation, against a person, *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967). Prior restraints are principally disfavored and bear a heavy presumption against validity because "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). Thus, "to secure an injunction, a party must show irreparable harm and the lack of an adequate remedy at law." *Black & White Cars v. Groome Transp., Inc.*, 247 Va. 526, 431 (1994). An injunction "must be specific in terms, and it must define the exact extent of its operation so that there may be

compliance." *Gillman*, 223 Va. At 770. The injunction should set forth what is enjoined in a clear and certain manner and its meaning should not be left for speculation or conjecture. *Id*.

Here, Plaintiffs request injunctive relief for its defamation claim. Plaintiffs argue that an injunction is appropriate for its defamation claim because there is irreparable harm from the dissemination of the Report, there is no adequate remedy at law that would deter Defendant from continuing to distribute the Report, and it will not be a prior restraint because the injunction would be narrowly tailored to the defamatory claims in paragraphs 92 through 104 and 111 through 121 of the Amended Complaint. Mem., ECF No. 31. The undersigned agrees.

Additionally, monetary damages awarded in this case would be inadequate because the injury would be continuous as Plaintiffs do not know who or how many people received a copy of the Report. Mem., ECF. No. 24 at 27; *see Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F. Supp. 2d 567, 587 (E.D. Va. 2000) (stating that monetary damages are typically regarded as inadequate where the injury is continuous or repeated); *see also Disney Enterprises, Inc. v. Delane*, 446 F. Supp. 2d 402, 408 (D. Md. 2006) (stating that permanent injunction is appropriate when future violations are a "continuing threat"). Therefore, without an injunction, Defendant could continue disseminating the Report and Plaintiffs would be forced to return to Court every time they become aware that the Report has been distributed. The undersigned also agrees that such a narrowly tailored injunction—prohibiting Defendant from repeating the statements in paragraphs 92 through 104 and 111 through 121 of the Amended Complaint—would be an appropriate prior restraint because Defendant's freedom of speech would only be chilled with regard to specific statements in the Complaint. Absent a prior restraint, Defendant would, in all likelihood based upon past conduct, continue to make the same defamatory allegations.

Therefore, the undersigned finds that injunctive relief is appropriate for Plaintiffs defamation claim.

## RECOMMENDATION

The undersigned Magistrate Judge finds that the submitted pleadings and affidavits establish that Plaintiffs are entitled to a default judgment against Defendant. Therefore, the undersigned recommends that Plaintiffs' Motion for Default Judgment be **GRANTED**. The undersigned recommends entry of default judgment in favor of Plaintiffs against Defendant in the amount of $16,050 for compensatory damages, $59,000 for punitive damages, and injunctive relief.

## NOTICE

**By mailing copies of this Report and Recommendation, the parties are notified that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of service on you of this Report and Recommendation. A failure to file timely objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.**

The Clerk is directed to send a copy of this Report and Recommendation to all counsel of record and to Defendant at the following address:

Philip Bryson Christopher
6197 Railroad Ave.
Cozet, Virginia 22932

/s/ Ivan D. Davis
_____
Ivan D. Davis
United States Magistrate Judge

April 23, 2020
Alexandria, Virginia