### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | |
|---|---|
| **B2GOLD CORP.,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 1:18-cv-1202 |
| ) | |
| **PHILIP BRYSON CHRISTOPHER,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM OPINION

Plaintiff B2Gold, Corp., a Canadian corporation that operates gold mines, and plaintiff Dale Craig, B2Gold Corp.'s Vice President of Operations, brought this defamation *per se* action against defendant Philip Bryson Christopher based on defendant Christopher's allegedly false and defamatory statements about plaintiffs' gold mining operations in Nicaragua.

At issue now in this matter is the Magistrate Judge's Report and Recommendation on plaintiffs' Motion for Default Judgment on plaintiffs' First Amended Complaint. The Magistrate Judge recommended entering default judgment against defendant Christopher on plaintiffs' defamation *per se* claim. The Magistrate Judge recommended relief consisting of $16,050 in compensatory damages, $59,000 in punitive damages, and an injunction forbidding defendant Christopher from continuing to make certain defamatory statements identified in the First Amended Complaint.[1] The Magistrate Judge did not recommend an award of attorney's fees. No objections to the Magistrate Judge's Report and Recommendation were filed.

For the reasons that follow, the Magistrate Judge's recommendations are adopted as set

---

[1] Specifically, the Magistrate Judge recommended enjoining defendant from repeating the defamatory statements alleged in ¶¶ 92–104 and ¶¶ 111–121 of plaintiffs' First Amended Complaint.

1

forth in this Memorandum Opinion, and plaintiffs' Motion for Default Judgment must be granted.

## I.

The Magistrate Judge's Report accurately sets forth the procedural and factual history of this case, and the Court adopts as its own the procedural and factual background set forth in the Report. On September 20, 2018, plaintiffs filed the original Complaint in this action, which alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspiracy to violate RICO, 18 U.S.C. § 1962(d), and defamation *per se* under Virginia law against several defendants, including defendant Christopher. Defendant Christopher was served with the original Complaint in this matter on October 5, 2018, and default was entered against defendant Christopher on November 8, 2018. On January 23, 2019, plaintiffs moved for default judgment on their original Complaint. On July 10, 2019, the Magistrate Judge completed a Report and Recommendation on plaintiffs' original motion for default judgment. An August 26, 2019 Order denied plaintiffs' motion for default judgment on plaintiffs' RICO claims, and supplemental jurisdiction was not exercised over plaintiffs' defamation *per se* claim.

On September 16, 2019, plaintiffs filed a First Amended Complaint alleging a single claim for defamation *per se* under Virginia law against defendant Christopher. Plaintiffs' First Amended Complaint alleges that defendant Christopher distributed a document, the "Spectre Report," that purported to describe plaintiffs' involvement in "a growing conspiracy over the last 10 years to defraud the people and the government of the patrimony of her gold." Plaintiffs' First Amended Complaint at ¶ 104. On October 15, 2019, plaintiffs filed a Motion for Default Judgment on their First Amended Complaint, and the Magistrate Judge took plaintiffs' motion under advisement on November 1, 2019.

On December 6, 2019, nearly thirteen months after entry of default, defendant Christopher filed a document entitled "Response to Plaintiff request for a Summary Default Judgement." The bulk of defendant Christopher's filing purports to describe defendants' actions in Nicaragua, but defendant Christopher's filing also requests "that this entire case be declined by the court" or, alternatively, that defendant Christopher "be granted a jury trial" because defendant Christopher believes he has "a strong defense."

As the Magistrate Judge correctly noted, defendant Christopher's filing did not constitute a response to the First Amended Complaint. *See* Report and Recommendation at 2 n. 1. Nevertheless, defendant Christopher's filing will be construed liberally as a motion to set aside entry of default pursuant to Rule 55(c), Fed. R. Civ. P. Because defendant Christopher fails to show good cause to set aside the entry of default in this case, defendant Christopher's motion must be denied.

Rule 55(c), Fed. R. Civ. P., provides that a court may set aside an entry of default "[f]or good cause shown." The Fourth Circuit has not specifically defined "good cause," but it has directed that district courts should consider (1) whether the moving party has a meritorious defense; (2) whether the moving party acts with reasonable promptness; (3) the defaulting party's culpability for the default; (4) the prejudice to the non-moving party; (5) whether there is a history of dilatory action; and (6) the availability and effectiveness of less drastic sanctions. *See Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204–05 (4th Cir. 2006); *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978). The Fourth Circuit has also made clear its strong preference that "defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010) (citations omitted). Here, the entry of default will not be set aside in this case because none of the

six *Payne* factors weigh in defendant Christopher's favor, and four of the six factors weigh heavily against defendant Christopher.

The first *Payne* factor, whether defendant Christopher has a meritorious defense, weighs heavily against setting aside the entry of default. At a minimum, the party seeking to set aside a default must proffer some "evidence" that would "permit a finding for the defaulting party or which would establish a valid counterclaim." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (quotations omitted). Here, defendant Christopher merely makes the conclusory assertion that he believes he has "a strong defense" and does not proffer any evidence that rebuts plaintiffs' defamation *per se* claim.

The second, third, and fifth *Payne* factors—whether defendant Christopher has moved with reasonable promptness to set aside default, whether defendant Christopher bears culpability for the default, and whether defendant Christopher has a history of dilatory action in this case—also weigh heavily against setting aside the entry of default here. Far from acting with reasonable promptness, defendant Christopher waited nearly thirteen months after entry of default to request that default be set aside in this matter. No party other than defendant Christopher is culpable for defendant Christopher's default. This case's record is replete with evidence of defendant Christopher's dilatory action. Defendant Christopher did not oppose plaintiffs' initial January 23, 2019 Motion for Default Judgment, did not object to the Magistrate Judge's July 10, 2019 Report and Recommendation, and did not oppose plaintiffs' October 15, 2019 renewed Motion for Default Judgment on plaintiffs' First Amended Complaint until after the Magistrate Judge took plaintiffs' motion under advisement. And notwithstanding defendant Christopher's statement of his desire to defend this action in his December 6, 2019 filing, defendant Christopher has not objected to the Magistrate Judge's April 24, 2020 Report and Recommendation. In sum, this

4

case's record reflects that defendant Christopher has engaged in a pattern of dilatory action without providing any justification.

The fourth and sixth *Payne* factors, prejudice to the non-moving party and the availability and effectiveness of less drastic sanctions, do not favor defendant Christopher. In the context of a motion to set aside an entry of default, as in other contexts, delay in and of itself does not constitute prejudice to the opposing party. *See Colleton Preparatory Acad., Inc.*, 616 F.3d at 418 (citing *Indigo America, Inc. v. Big Impressions, LLC*, 597 F.3d 1, 4 (1st Cir. 2010)). And "no cognizable prejudice inheres in requiring a plaintiff to *prove* a defendant's liability, a burden every plaintiff assumes in every civil action filed in every federal court." *Id.* But setting aside default here would prejudice plaintiffs by causing them to incur additional expenses related to this action. Accordingly, plaintiffs would suffer some prejudice if default were set aside.

In analyzing the sixth *Payne* factor, the Fourth Circuit has recognized that default should be set aside where less drastic financial sanctions such as an award of the non-movant's costs and attorney's fees would be effective. *See Colleton Preparatory Acad., Inc.*, 616 F.3d at 418; *Augusta Fiberglass Coatings, Inc.*, 843 F.2d at 811. But here, defendant Christopher's filing indicates that financial sanctions would be ineffective because defendant Christopher describes his "financial situation" as "extremely distressed." Thus, it is unlikely that an award of costs and attorney's fees would provide an effective sanction that would compensate plaintiffs for the expenses associated with setting aside entry of default and prompt defendant to defend this action. Accordingly, the fourth and sixth *Payne* factors do not favor setting aside default.

In summary, none of the *Payne* factors favor setting aside default favor defendant Christopher, and defendant Christopher's lack of a meritorious defense, failure to move promptly to set aside default, culpability for the default, and history of dilatory action in this case weigh

5

strongly against setting aside default here. Accordingly, defendant Christopher remains in default in this matter.

**II.**

With respect to the entry of default judgment, the Magistrate Judge's recommendation that default judgment be entered in plaintiffs' favor and against defendant Christopher on plaintiffs' defamation *per se* claim will be adopted as set forth below.

The Magistrate Judge's recommendations as to subject matter jurisdiction, personal jurisdiction, service of process, and venue are adopted. Plaintiffs' defamation *per se* claim is within the Court's diversity jurisdiction pursuant to § 13332(a)(2). Defendant Christopher, a Virginia domiciliary, is subject to general personal jurisdiction in Virginia. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."). Defendant Christopher was properly served with process pursuant to Rules 4(e) and 5(a)(2), Fed. R. Civ. P. And venue is proper in this district because defendant Christopher resides in Virginia and disseminated the "Spectre Report" while present in the Eastern District of Virginia. 28 U.S.C. § 1391(b)(1)–(2).

In Virginia, a plaintiff claiming defamation must allege (1) the publication of (2) an actionable statement[2] (3) with the requisite intent. *Jordan v. Kollman*, 269 Va. 569, 575 (2005).

---

[2] To be "actionable," a statement must be a false assertion of fact that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 922 (E.D. Va. 2004).

Four categories of statements are defamatory *per se* without proof of damages:

(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished;

(2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would

As the Magistrate Judge observed, defendant Christopher published the alleged defamatory statements to third parties by sending the "Spectre Report" to several recipients. In analyzing the alleged defamatory *per se* statements, the Magistrate Judge emphasized that several of the alleged statements imputed the commission of crimes of moral turpitude such as bribery, fraud, and false reporting of income. *See Great Coastal Exp., Inc. v. Ellington*, 230 Va. 142, 149 (1985) (holding that commercial bribery is an offense involving moral turpitude and thus may be the subject of defamation *per se*), *overruled on other grounds by Cashion v. Smith*, 286 Va. 327 (2013). The Magistrate Judge also noted that a corporation may be defamed *per se* by statements "which cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business." *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F.2d 1063, 1071 (4th Cir. 1993) (quoting *Gen. Prods. Co., Inc. v. Meredith Corp.*, 526 F. Supp. 546, 549–50 (E.D. Va. 1981)). And the Magistrate Judge concluded that defendant Christopher made these defamatory statements with actual malice, that is, with "knowledge that [a statement] was false or with reckless disregard of whether or not it was false." *Swengler*, 993 F.2d at 1071 (quoting *Newspaper Publ'g Corp. v. Burke*, 216 Va. 800, 805 (1976)).

The Magistrate Judge's recommendations as to the elements of publication and actual malice are adopted. The Magistrate Judge's recommendations as to the element of actionability are adopted insofar as the following statements that appeared in the "Spectre Report" disseminated by defendant Christopher are actionable under Virginia law. *Chapin v. Knight-*

---

exclude the party from society;

(3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.

(4) Those which prejudice such person in his or her profession or trade.

*Perk v. Vector Res. Grp., Ltd.*, 253 Va. 310, 316 (1997).

7

*Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (stating that whether an alleged defamatory statement is actionable under Virginia law is a question of law for the court to decide).

1. "Suffice it to say the manner used by B2Gold and her Nicaraguan owned subsidiary, DESMINIC in La Libertad and Santo Domingo, Chontales can be described as criminal in every way. Extortion, Coercion, Usurpation, Threats are words that accurately describe the activities of B2Gold and its operators. Bribery is applied liberally on a massive scale to include judges, police, government accountants and more. This is a conspiracy that goes from the pueblo and campo to the Secretaria, Assemblia, CSJ and, of course, the Ministry of Energy and Mines (MEM)." Plaintiffs' First Amended Complaint at ¶ 98a.

2. "Even B2Gold admits in their own documents that the percentage of revenue paid as TAXES IS ONLY 5%." *Id.* at ¶ 98b.[3]

3. "Most of the numbers we will quote going forward in this report are drawn directly from the Chontales NI 43-101." *Id.* at ¶ 98c.

4. "Source: B2Gold NI 43-101, dated March 27, 2015." *Id.* at ¶ 98d.

5. "B2Gold did not want to let on just how much gold was actually there in Chontales. B2Gold, most likely with the willing help of MEM, appears to have dramatically understated the resource." *Id.* at ¶ 98e.

6. "So B2Gold may be understating production by a factor of three or four times." *Id.* at ¶ 98f.

7. "For years, the production in La Libertad for B2Gold has been reported in their SEC documents as roughly $800,000 per day, but our intelligence gathering consistently informs us that they are producing $1.2 million." *Id.* at ¶ 98g.

8. "A final point of discussion concerning the national instrument produced by B2Gold, their firm is not a sophisticated deep resource miner, but are more so just bulldoze managers, ie surface ore extractors. Thus they produced an NI for surface material extraction that only goes to a depth of 400 meters" *Id.* at ¶ 98h.

9. "B2Gold may be understating production by three fold and ignoring a resource within the exact veins measured in their NI that may be five, six seven times bigger. In other words,

---

[3] The attribution of a fabricated quotation to a plaintiff may give rise to a defamation claim where the attribution causes reputational harm. *See Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 80, 894 (2013). With respect to the statements listed in ¶¶ 98b, 98c, 98d, the attribution of quotations to plaintiffs "cast aspersion on [plaintiffs'] honesty, credit, efficiency or [their] prestige or standing in [their] field of business." *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F.2d 1063, 1071 (4th Cir. 1993) (quoting *General Prods. Co., Inc. v. Meredith Corp.*, 526 F. Supp. 546, 549–50 (E.D. Va. 1981)).

    the numbers we will now share specifically might be in reality 15 to 20 times larger ( 3 * 6) than B2Gold is showing in their NI." *Id.* at ¶ 98i.

10. "B2Gold, we estimate almost doubles the real costs in their SEC reporting to make the mine appear less profitable then it is actually is." *Id.* at ¶ 98j.

11. "If costs have say doubled or a bit more, but efficiencies have been almost 100%, then costs should be almost unchanged, but B2Gold reports all-in costs of $1100 per ounce. $700 to 800 would be far more believable. Over-reporting costs allows B2Gold to hide the costs of their bribery and graft from the international finance community and the Securities & Exchange Commissions (SECs) of the US and Canada." *Id.* at ¶ 98k.

12. The statement that plaintiff Craig is "a primary co-conspirator" and the following statement: "Mr Craig, Canadian citizen, is either directly involved as senior manager of the conspiracy or is choosing to pretend he does not know. We favor directly involved, although probably rarely or never interacts with top Sandinistas." *Id.* at ¶ 99.

13. "Omar Vega, functional President of DESMINIC SA. Reports to Zarruk and Craig. Distributes bribes and pay-offs, manages thru others coercion and threats." *Id.* at ¶ 100a.

14. "Carlos Barberena, Chief Operating Officer of DESMINIC. Reports to Vega and Zarruk. Designs and implements policies to repress the [Small Miners Community ("SMC")]." *Id.* at ¶ 100b.

15. "Denis Quintanilla, Head of Security for DESMINIC and B2Gold. Implements armed invasions and other dirty tricks against SMC. Reports to Barberena." *Id.* at ¶ 100c.

16. "Raul Novoa, attorney for DESMINIC and B2Gold. Reports to Vega and Barberena. Acts as repression agent to SMC at the legal system level." *Id.* at ¶ 100d.

17. "Alejandro Bermudez, attorney for DESMINIC and B2Gold. Leads local conspiracy to suborn courts and police. Lead local repression agent, particularly for violating civil rights of SMC. Reports to Omar Vega & Dr Novoa." *Id.* at ¶ 100e.

18. "Ivan Lara, DESMINIC, reports to Mr Vega. Mr Lara leads coercion efforts in the Chontales region for B2Gold & DESMINIC. Works with local police and when needed riot police to intimidate and even physically attack small miners." *Id.* at ¶ 100f.

19. "Erasmo Rivas Aruaz, head of workers union for B2Gold/DESMINIC. Key repression agent to SMC. Now heads para-military contingent controlling La Libertad vein. Reports to Porras, Murrillo and Vega." *Id.* at ¶ 100g.

20. The statement that B2Gold is a "prime conspirator in the El Jackson," as well as the following statement: "B2Gold – breaking US laws to include Foreign Corrupt Practices Act, RICO, Patriot and the Securities and Exchange Act. NYSE & TSE listings should be carefully reviewed for delisting." *Id.* at ¶ 102.

21. "Small miners are offered a small sum of money, usually less than 1/100 of one percent of fair global value for In-Ground reserves. They are then told take the payment or the Antimotines will come and throw them off anyway and they will get nothing, except maybe some jail time. Most take the pay off and then realize they can no longer feed their families in a week, two at most. … We believe hundred[s] of small miners may have a legitimate claim to be restored to the land they 'sold' to B2Gold." *Id.* at ¶ 103a.

22. "Families have been invited to 'community dinners' and when the men return to their claim there are B2Gold armed guards forbidding entry." *Id.* at ¶ 103b.

23. "Another trick played on small miners is the land trade offer. B2Gold did this to about 30 small miners late last year. They give them concession rights in a different area of Chontales. The small miners are told that this land is just as rich as the land they are giving up to B2Gold. 28 of the 30 miners scammed in this gambit gave up working the new terrain almost immediately as the quality of the land they received in trade is worthless for gold extraction by artesenial methods." *Id.* at ¶ 103c.

24. "Nicaragua has suffered a growing conspiracy over the last 10 years to defraud the people and the government of the patrimony of her gold. In Chontales, B2Gold of Vancouver, Canada and her wholly owned Nicaraguan subsidiary, DESMINIC have been the primary international miners involved in the corruption against the Kauffmann family and hundreds of other small miners." *Id.* at ¶ 104.

None of the other statements identified in plaintiffs' First Amended Complaint satisfy the requirements for defamation under Virginia law.[4]

The Magistrate Judge's recommended awards of $16,050 in compensatory damages and $59,000 in punitive damages will be adopted. As noted, defendant Christopher has indicated that he has not retained counsel because his financial situation is distressed. Thus, it is not clear that an award of damages greater than that recommended by the Magistrate Judge would have any additional deterrent effect.

---

[4] Specifically, the statements listed in ¶¶ 103d and 103e do not constitute defamation *per se*. The statement in ¶ 103d asserts that the gold processed by plaintiffs exceeded plaintiffs' expectations, which does not prejudice plaintiffs in their profession or trade. *See id.* ("And further, our intelligence coming from mill workers for B2Gold is telling us that the material B2Gold is processing is three times richer than their NI anticipated."). The statement in ¶ 103e constitutes an opinion. *See id.* ("Visit a gold field in Nicaragua… From main street La Libertad you see a scene of the earth being vacuum cleaned around a lonely chapel left standing. Up the road in Santa Domingo half the town is perched now on a massive open pit and B2Gold wants to move the entire town or dig under it.").

Plaintiffs' Motion for Default Judgment seeks a permanent injunction that prohibits defendant Christopher from repeating "the false and defamatory statements outlined in Paragraphs 98 through 100 and paragraphs 102 through 104 of the [First Amended Complaint] . . . ."[5] As the Supreme Court has made clear, a plaintiff seeking a permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury;
>
> (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
>
> (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;
>
> (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted); *see also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (same).

Neither the Supreme Court of Virginia nor the Fourth Circuit has addressed whether a prevailing defamation plaintiff may obtain an injunction prohibiting a defendant from repeating defamatory speech. Where a defendant's statements have been found to be false and defamatory in a judicial proceeding, several appellate courts have held that a court may enjoin a defendant from repeating those false and defamatory statements.[6] As the Seventh Circuit and the Supreme

---

[5] The Magistrate Judge recommended an injunction against further dissemination of the defamatory statements identified in in ¶¶ 92–104 and ¶¶ 111–121 of plaintiffs' First Amended Complaint. The additional paragraphs included in the Magistrate Judge's recommendation as to injunctive relief correspond to allegations regarding the Spectre Report's creation and dissemination.

[6] *See Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09 (6th Cir. 1990) (Wellford, J., concurring) (announcing the court's holding with respect to injunctive relief); *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) ("An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint."); *Balboa Island Village Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1155–56 (2007) (holding that a court may enjoin the repetition of a statement that was determined at trial to be defamatory).

11

Court of California have noted, a contrary rule—namely that speech determined to be defamatory in a judicial proceeding may not be enjoined—"would make an impecunious defamer undeterrable." *McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015) (citing *Balboa Island Village Inn, Inc.*, 40 Cal. 4th at 1158). An injunction against the repetition of defamatory speech must be no "broader than necessary to provide relief to plaintiff while minimizing the restriction of expression." *McCarthy*, 810 F.3d at 462 (vacating as overbroad an injunction that prohibited "any similar statements that contain the same sorts of allegations or inferences, in any manner or forum") (quoting *Balboa Island Village Inn, Inc.*, 40 Cal. 4th at 1160 (prohibiting only the defendant herself from repeating defendant's defamatory statements)); *see also Sindi v. El-Moslimany*, 896 F.3d 1, 34–35 (1st Cir. 2018) (vacating injunction because use of same words held to be defamatory in one context could constitute protected speech in other, future contexts).

  Here, plaintiffs have satisfied the requirements to obtain a permanent injunction that prohibits defendant Christopher from repeating the defamatory statements identified above. *See eBay Inc.*, 547 U.S. at 391. First, plaintiffs have established that dissemination of the false and defamatory statements contained in the Spectre Report has caused irreparable harm. Because plaintiffs are not certain of the identities of the recipients of the Spectre Report, plaintiffs are unable to attempt to repair their reputations by contacting those individuals. Second, monetary damages will not provide an adequate remedy for plaintiffs because, in the event defendant continues to defame plaintiffs, plaintiffs "would be required to bring a succession of lawsuits if an award of damages was insufficient to deter the defendant from continuing" to defame plaintiffs. *Balboa Island Village Inn, Inc.*, 40 Cal. 4th at 1158 (noting that monetary damages may not effectively deter "judgment proof" or wealthy defendants). Third, in light of the balance of the hardships between defendant and plaintiffs, a remedy in equity is warranted because

defendant remains able to express himself in a manner that does not repeat the statements that have been determined to be defamatory. Fourth, the public interest would not be disserved by an injunction narrowly tailored to prohibit repetition of the statements set forth above that qualify as defamatory under Virginia law because listeners would continue to have access to defendant Christopher's non-defamatory speech. *See McCarthy*, 810 F.3d at 463 (vacating an injunction "so broad and vague that it threatens to silence [defendants] completely").

An order granting an injunction must (i) state the reasons why it issued; (ii) state its terms specifically; and (iii) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required. Rule 65(d)(1), Fed. R. Civ. P. Because defendant Christopher has engaged in repeated acts of defamation *per se*, an Order will issue that permanently enjoins defendant Christopher from repeating the statements set forth above that have been held to be defamatory. Specifically, the Order will permanently restrain and enjoin defendant Christopher from publishing the defamatory statements set forth above to recipients within the United States by mail, email, or other social media.

The Magistrate Judge also recommended that plaintiffs' request for attorney's fees be denied, and plaintiffs have not objected. Accordingly, the Magistrate Judge's recommendation as to the denial of an award of attorney's fees is adopted.

For the reasons stated above, plaintiffs' Motion for Default Judgment will be granted. Default judgment in favor of plaintiffs and against defendant will be entered in the total amount of $75,050, and defendant will be permanently enjoined in accordance with this Memorandum Opinion.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record and defendant Philip Bryson Christopher at his last known address.

Alexandria, Virginia
May 28, 2020

/s/
T. S. Ellis, III
United States District Judge